Exhibit 1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIVISION

AON RISK SERVICES, INC. OF FLORIDA, AON RISK SERVICES COMPANIES, INC., and AON GROUP INC.,

                Plaintiffs,                    Case No. 2021-015086-CA-01 (44)

vs.

MARSH USA INC., MARSH & MCLENNAN AGENCY LLC, MICHAEL PARRISH, CAROLINE PARRISH, ROBERT LYNN, MICHAEL LANDA, GISELLE LUGONES, RAYMOND B. SCOTT, ADAM LICKSTEIN, MATTHEW MAFFAI, DEREK CARNEY, SCOTT GARMAN, JULIE LAYTON, and JANETTE WILCOX,

                Defendants.

_____

MICHAEL LANDA,

                Counter-Plaintiff,

v.

AON RISK SERVICES, INC. OF FLORIDA, AON RISK SERVICES COMPANIES, INC., and AON GROUP INC.,

                Counter-Defendants.

_____

GISELLE LUGONES,

                Counter-Plaintiff,

v.

AON RISK SERVICES, INC. OF FLORIDA,

                Counter-Defendant.

_____

1

### DEFENDANTS MICHAEL PARRISH, MICHAEL LANDA, AND GISELLE LUGONES'S OMNIBUS ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' VERIFIED AMENDED COMPLAINT

Defendants Michael Parrish, Michael Landa, and Giselle Lugones (each a "Defendant" and together, the "PLL Defendants") hereby respond to Plaintiffs Aon Risk Services, Inc. of Florida, Aon Risk Services Companies, Inc., and Aon Group Inc.'s (collectively with their affiliates, "Aon") Verified Amended Complaint.

1.      Admitted that Aon has brought an action against the PLL Defendants, and others. Denied that Aon has stated any claims for relief and further denied that Aon is entitled to any relief.

2.      Admitted that Aon and Marsh are competitors, otherwise denied.

3.      Denied.

4.      Denied.

5.      Without sufficient knowledge and, therefore, denied.

6.      Admitted that the PLL Defendants gave notice of their resignations on June 10, 2021, otherwise denied.

7.      Without sufficient knowledge and, therefore, denied.

8.      Admitted that Mr. Parrish was a Regional Managing Director of Aon and that he was a member of Aon's Executive Leadership Team, otherwise denied.

9.      Without sufficient knowledge and, therefore, denied.

10.     Defendants lack information sufficient to form a belief as to Aon's state of mind. Otherwise denied.

11.     Admitted that in June 2021, around the time he resigned, Mr. Parrish volunteered to Ms. Goltermann that he had shared his personal contacts from his work cell phone to his private cell phone so that he would have his personal contact information, and Ms. Goltermann responded

that she had done the same thing and it was okay to do so. Shortly afterward, Mr. Parrish deleted the contacts from his personal cell phone so there would be no issues as to his conduct. Otherwise denied.

12.     Admitted that Ms. Lugones attempted to email a copy of her "book run" to herself, which is usual and customary, so that she would have a record of her production in the event there were any issues as to her production for compensation purposes. In fact, the email did not go through because it was apparently blocked by Aon's server, and the following month, Aon sent Ms. Lugones a copy of her book run. Otherwise denied.

13.     Denied.

14.     Denied.

15.     Admitted that Ms. Lugones is a producer in the healthcare market. Further admitted that Ms. Lugones and Mr. Parrish each had a 45-day notice period in their Employment Agreements and that Mr. Landa had a 90-day notice period in his Employment Agreement. Otherwise denied.

16.     Without sufficient knowledge and, therefore, denied.

17.     Denied.

18.     Admitted.

19.     Admitted.

20.     Admitted as to state of incorporation, otherwise denied.

21.     There is no allegation in paragraph 21 of the Verified Amended Complaint and, as such, no response is required.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

27.     Admitted.

28.     Admitted.

29.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

30.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

31.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

32.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

33.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

34.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

35.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

36.     Admitted that this Court has jurisdiction, otherwise denied.

37.     Admitted that jurisdiction is proper as to the PLL Defendants, otherwise denied.

38.     Admitted that venue is proper as to the PLL Defendants, otherwise denied.

39.     Admitted that this case is properly assigned to the Complex Business Division, otherwise denied.

40.     Admitted that Aon provides risk management products to clients around the globe, otherwise denied.

41.     Admitted that Aon has lines of business in the Commercial Risk and Health Solutions market, otherwise denied.

42.     Admitted that Mr. Parrish was Robert Lynn were senior executives in the Commercial Risk and Health Solutions business, and that Robert Lynn reported to Michael Parrish at the time they each left Aon. Otherwise denied.

43.     Admitted that Mr. Parrish was the Head of the East Region for Aon's U.S. Commercial Risk and Health business. Further admitted that Mr. Parrish had access to certain information Aon deemed appropriate for someone occupying Mr. Parrish's position, and that Mr. Parrish carried out the job duties assigned to a regional leader at Aon. Otherwise denied.

44.     Admitted that Mr. Parrish served on Aon's National Producer Council, Executive Leadership Team, and U.S. Commercial Risk and Health Executive Committee. Further admitted that Mr. Parrish had access to certain information Aon deemed appropriate for someone occupying Mr. Parrish's position. Otherwise denied.

45.     Admitted that Mr. Parrish was the Head of the East Region for Aon's U.S. Commercial Risk and Health business. Further admitted that Mr. Parrish had access to certain information Aon deemed appropriate for someone occupying Mr. Parrish's position, and that Mr. Parrish carried out the job duties assigned to a regional leader at Aon. And admitted that Ms. Lugones and Mr. Landa are highly talented and successful in their respective lines of business. Otherwise denied.

46.     Admitted that the PLL Defendants were granted access to certain information Aon deemed necessary for each of said Defendants to perform their respective job functions. Otherwise denied.

47.     Denied.

48.     Denied; to the contrary, Aon published information about the PLL Defendants' compensation in this lawsuit.

49.     Admitted that Mr. Parrish was the Head of the East Region for Aon's U.S. Commercial Risk and Health business. Further admitted that Mr. Parrish had access to certain information Aon deemed appropriate for someone occupying Mr. Parrish's position, and that Mr. Parrish carried out the job duties assigned to a regional leader at Aon. Otherwise denied.

50.     Without sufficient information and, therefore, denied.

51.     Admitted that the insurance marketplace is competitive. Otherwise denied.

52.     Without sufficient information and, therefore, denied.

53.     Without sufficient information and, therefore, denied.

54.     As to the PLL Defendants, admitted only that, at Aon, they received some training, some administrative and technical support, and the reimbursement of some expenses. Otherwise denied.

55.     Admitted that the PLL Defendants were granted access to certain information. Otherwise denied.

56.     Without sufficient information and, therefore, denied.

57.     Admitted that a copy of a document purporting to be Aon's Code of Business Conduct is attached to the Verified Amended Complaint as Exhibit 1, but denied to the extent the allegation varies from the language of Exhibit 1. Further denied that the Code of Business Conduct created binding legal obligations. Otherwise denied.

58.     Admitted that a copy of a document purporting to be Aon's Code of Business Conduct is attached to the Verified Amended Complaint as Exhibit 1, but denied to the extent the allegation varies from the language of Exhibit 1. Further denied that the Code of Business Conduct created binding legal obligations. Otherwise denied.

59.     Admitted that copies of documents purporting to be Aon's Global Information Governance and Email Policies are attached to the Verified Amended Complaint as Exhibits 2 and 3, but denied to the extent the allegation varies from the language of Exhibits 2 and 3. Further denied that the Global Information Governance and Email Policies created binding legal obligations. Otherwise denied.

60.     Admitted that a copy of a document purporting to be Aon's Electronic Transmission of Protected Information Policy is attached to the Verified Amended Complaint as Exhibit 4, but denied to the extent the allegation varies from the language of Exhibit 4. Further

denied that the Electronic Transmission of Protected Information Policy created binding legal obligations. Otherwise denied.

61.     Admitted that a copy of a document purporting to be Aon's Encryption Standard Policy is attached to the Verified Amended Complaint as Exhibit 5, but denied to the extent the allegation varies from the language of Exhibit 5. Further denied that the Encryption Standard Policy created binding legal obligations. Otherwise denied.

62.     Admitted that a copy of a document purporting to be Aon's PCs and Laptops Policy is attached to the Verified Amended Complaint as Exhibit 6, but denied to the extent the allegation varies from the language of Exhibit 6. Further denied that the PCs and Laptops Policy created binding legal obligations. Otherwise denied.

63.     Admitted that the PLL Defendants were asked to sign Employment Agreements. Otherwise, without sufficient information and, therefore, denied.

64.     Admitted that the PLL Defendants were asked to sign Employment Agreements. Otherwise, without sufficient information and, therefore, denied.

65.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

66.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

67.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

68.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

69.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

70.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

71.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

72.     Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and

21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

73.    Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

74.    Admitted that documents purporting to be the PLL Defendants' respective Employment Agreements are attached to the Verified Amended Complaint as Exhibits 9, 10, and 21, but denied to the extent the allegation varies from the language of Exhibits 9, 10, and 21. Otherwise denied.

75.    Without sufficient information and, therefore, denied.

76.    Admitted that Marsh and Aon are competitors. Without sufficient information and, therefore, denied as to the remainder.

77.    Denied.

78.    Admitted that Marsh competes with Aon in Florida, otherwise denied.

79.    Admitted that the PLL Defendants gave notice of their resignations on June 10, 2021. Otherwise denied.

80.    Admitted that the PLL Defendants gave notice of their resignations on June 10, 2021. Otherwise without sufficient knowledge and, therefore, denied.

81.    Without sufficient knowledge and, therefore, denied.

82.    Admitted that each of the PLL Defendants had notice provisions in their respective Employment Agreements and further admitted that the PLL Defendants gave notice of their resignations. Otherwise denied.

83.   Denied.

84.   Without sufficient knowledge and, therefore, denied.

85.   Without sufficient knowledge and, therefore, denied.

86.   Without sufficient knowledge and, therefore, denied.

87.   Without sufficient knowledge and, therefore, denied.

88.   Admitted that the PLL Defendants had dinner on May 10, 2021, otherwise denied.

89.   Admitted that in June 2021, around the time he resigned, Mr. Parrish volunteered to Ms. Goltermann that he had shared his personal contacts from his work cell phone to his private cell phone so that he would have his personal contact information, and Ms. Goltermann responded that she had done the same thing and it was okay to do so. Shortly afterward, Mr. Parrish deleted the contacts from his personal cell phone so there would be no issues as to his conduct. Otherwise denied by Mr. Parrish. Without sufficient knowledge and, therefore, denied by Mr. Landa and Ms. Lugones.

90.   Denied by Mr. Parrish. Without sufficient knowledge and, therefore, denied by Mr. Landa and Ms. Lugones.

91.   This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, without sufficient knowledge and, therefore, denied.

92.   The PLL Defendants lack information sufficient to form a belief as to what "reports" Aon received, and on that basis deny the allegations set forth in this paragraph.

93.   Without sufficient knowledge and, therefore, denied.

94.   Without sufficient knowledge and, therefore, denied.

95.   Without sufficient knowledge and, therefore, denied

96.     Without sufficient knowledge and, therefore, denied

97.     Admitted that Ms. Lugones has a compensation plan with Marsh and that such plan, which is not attached to the Verified Amended Complaint, speaks for itself. Denied insofar as this allegation differs from Ms. Lugones's compensation plan with Marsh. With respect to Messrs. Parrish and Landa, without sufficient knowledge and, therefore, denied.

98.     Admitted that Ms. Lugones has a compensation plan with Marsh and that such plan, which is not attached to the Verified Amended Complaint, speaks for itself. Denied insofar as this allegation differs from Ms. Lugones's compensation plan with Marsh. With respect to Messrs. Parrish and Landa, without sufficient knowledge and, therefore, denied.

99.     Admitted that Ms. Lugones's interrogatory answers speak for themselves and to the extent the allegation conflicts with those answers, denied. And denied as to the other allegations. With respect to Messrs. Parrish and Landa, without sufficient knowledge and, therefore, denied.

100.    Admitted that Mr. Parrish has a compensation plan with Marsh and that such plan, which is not attached to the Verified Amended Complaint, speaks for itself. Denied insofar as this allegation differs from Mr. Parrish's compensation plan with Marsh and otherwise denied. With respect to Mr. Landa and Ms. Lugones, without sufficient knowledge and, therefore, denied.

101.    Without sufficient knowledge and, therefore, denied.

102.    Denied.

103.    Without sufficient knowledge and, therefore, denied.

104.    Denied by Ms. Lugones. Without sufficient knowledge and, therefore, denied by Messrs. Parrish and Landa.

105.    The PLL Defendants lack information sufficient to form a belief as to what "reports" Aon received, and on that basis deny the allegations set forth in this paragraph.

106.   Without sufficient knowledge and, therefore, denied.

107.   Admitted that certain former clients of Aon have chosen to no longer work with Aon and that such choice was within those clients' rights. Otherwise denied.

108.   Denied by Mr. Landa. Without sufficient knowledge and, therefore, denied by Mr. Parrish and Ms. Lugones.

109.   Without sufficient knowledge and, therefore, denied.

110.   <u>As for Mr. Parrish</u>: Admitted that in June 2021, around the time he resigned, Mr. Parrish volunteered to Ms. Goltermann that he had shared his personal contacts from his work cell phone to his private cell phone so that he would have his personal contact information, and Ms. Goltermann responded that she had done the same thing and it was okay to do so. Shortly afterward, Mr. Parrish deleted the contacts from his personal cell phone so there would be no issues as to his conduct. Otherwise denied. <u>As for Ms. Lugones</u>: Admitted that Ms. Lugones attempted to email a copy of her "book run" to herself, which is usual and customary, so that she would have a record of her production in the event there were any issues as to her production for compensation purposes. In fact, the email did not go through because it was apparently blocked by Aon's server, and the following month, Aon sent Ms. Lugones a copy of her book run. Otherwise denied. <u>As for Mr. Landa</u>: Without sufficient knowledge and, therefore, denied.

111.   Denied.

## Count 1

112.   The PLL Defendants incorporate their responses to paragraphs 1–111 as if fully set forth herein.

113.   The allegation in this paragraph is a legal conclusion and, as such, no response is required. To the extent a response is required, denied.

114.    Denied.

115.    For Mr. Parrish only, denied. For Mr. Landa and Ms. Lugones, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

116.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

117.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

118.    For Mr. Landa only, denied. For Mr. Parrish and Ms. Lugones, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

119.    For Ms. Lugones only, denied. For Messrs. Parrish and Landa, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

120.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

121.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

122.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

123.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

124.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

125.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

126.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

127.     Without sufficient knowledge and, therefore, denied.

128.     Without sufficient knowledge and, therefore, denied.

129.     Denied.

130.     Without sufficient knowledge and, therefore, denied.

131.     Admitted the Employment Agreements contain attorney-fee provisions, otherwise denied.

132.     Admitted that Section 542.335 is a current statute and that it speaks for itself. To the extent this allegation is inconsistent with the official version of Section 542.335 or seeks to interpret or apply Section 542.335, denied.

133.     Admitted that Section 542.335 is a current statute and that it speaks for itself. To the extent this allegation is inconsistent with the official version of Section 542.335 or seeks to interpret or apply Section 542.335, denied.

**WHEREFORE**, the PLL Defendants request that the Court enter judgment in their favor, and against Aon, and award them their attorney's fees and costs, along with all other relief the Court deems just and proper.

## Count 2

134.    The PLL Defendants incorporate their responses to paragraphs 1–111 as if fully set forth herein.

135.    The allegation in this paragraph is a legal conclusion and, as such, no response is required. To the extent a response is required, denied.

136.    Denied.

137.    Denied.

138.    Without sufficient knowledge and, therefore, denied.

139.    Without sufficient knowledge and, therefore, denied.

140.    Denied.

141.    Without sufficient knowledge and, therefore, denied.

142.    Admitted the Employment Agreements contain attorney-fee provisions, otherwise denied.

**WHEREFORE**, the PLL Defendants request that the Court enter judgment in their favor, and against Aon, and award them their attorney's fees and costs, along with all other relief the Court deems just and proper.

## <u>Count 3</u>

143.    The PLL Defendants incorporate their responses to paragraphs 1–111 as if fully set forth herein.

144.    To the extent this paragraph states legal conclusions, the PLL Defendants are not required to respond. On that basis, to  the extent any response is deemed to be required, the PLL Defendants deny the allegations set forth in this paragraph.

145.     For Mr. Parrish only, denied. For Mr. Landa and Ms. Lugones, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

146.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

147.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

148.     For Mr. Landa only, denied. For Mr. Parrish and Ms. Lugones, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

149.     For Ms. Lugones only, denied. For Messrs. Parrish and Landa, this allegation is not brought against them and, as such, no response is required. To the extent a response is required, denied.

150.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

151.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

152.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

153.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

154.     This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

155.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

156.    This allegation is not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

157.    Without sufficient knowledge and, therefore, denied.

158.    Without sufficient knowledge and, therefore, denied.

159.    Denied.

**WHEREFORE**, the PLL Defendants request that the Court enter judgment in their favor, and against Aon, and award them their attorney's fees and costs, along with all other relief the Court deems just and proper.

### Count 4

160.–172.    This claim and the allegations within it are not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

### Count 5

173.    The PLL Defendants incorporate their responses to paragraphs 1–111 as if fully set forth herein.

174.    To the extent this paragraph states legal conclusions, the PLL Defendants are not required to respond. To the extent any response is deemed to be required, the PLL Defendants deny the allegations set forth in this paragraph.

175.    Denied.

176.    Denied.

177.    Without sufficient knowledge and, therefore, denied.

178.    Without sufficient knowledge and, therefore, denied.

179.    Without sufficient knowledge and, therefore, denied.

180.    Denied.

181.    **WHEREFORE**, the PLL Defendants request that the Court enter judgment in their favor, and against Aon, and award them their attorney's fees and costs, along with all other relief the Court deems just and proper.

## Count 6

182.–193.    This claim and the allegations within it are not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

## Count 7

194.–207.    This claim and the allegations within it are not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

## Count 8

208.–217.    This claim and the allegations within it are not brought against the PLL Defendants and, as such, no response is required. To the extent a response is required, denied.

## Count 9

218.    The PLL Defendants incorporate their responses to paragraphs 1–111 as if fully set forth herein.

219.    Denied.

220.    Denied.

221.    Admitted that Section 542.335 is a current statute and that it speaks for itself. To the extent this allegation is inconsistent with the official version of Section 542.335 or seeks to interpret or apply Section 542.335, denied.

222.   Denied.

223.   Without sufficient knowledge and, therefore, denied.

224.   Without sufficient knowledge and, therefore, denied.

225.   Without sufficient knowledge and, therefore, denied.

226.   Without sufficient knowledge and, therefore, denied.

227.   Denied.

228.   Denied.

229.   Denied.

230.   Denied.

231.   Denied.

232.   Denied.

233.   Denied.

234.   Denied.

235.   Denied.

236.   Without sufficient knowledge and, therefore, denied.

237.   Admitted the Employment Agreements contain attorney-fee provisions, otherwise denied.

238.   Admitted that Section 542.335 is a current statute and that it speaks for itself. To the extent this allegation is inconsistent with the official version of Section 542.335 or seeks to interpret or apply Section 542.335, denied.

**WHEREFORE**, the PLL Defendants request that the Court enter judgment in their favor, and against Aon, and award them their attorney's fees and costs, along with all other relief the Court deems just and proper.

## DEFENSES

1.  The Complaint fails to state a cause of action against any of the PLL Defendants.

2.  Plaintiffs' standalone injunctive claim should be dismissed because injunctive relief is not a proper claim for relief, but rather a remedy that is available upon a finding of liability on a claim.

3.  To the extent that Plaintiffs are seeking damages based on their claim for tortious interference, it is duplicative of their breach of contract claims, and thus, the claim for tortious interference should be barred.

4.  The restrictive covenants in Mr. Parrish's Employment Agreement are overbroad and unenforceable.

5.  The restrictive covenants in Mr. Landa's Employment Agreement are overbroad and unenforceable.

6.  The restrictive covenants in Ms. Lugones's Employment Agreement are overbroad and unenforceable.

7.  The restrictive covenants contained within the PLL Defendants' Employment Agreements constitute an unlawful restraint on trade for, but not limited to, the following reasons: the restrictive covenants are overbroad as they purport to restrict the PLL Individual Defendants from soliciting and servicing former Aon clients and restrict the PLL Defendants from soliciting and servicing Aon clients for longer than one year.

8.  The PLL Defendants have a right to association and the exercise of that right does not provide a basis for any of Aon's claims.

9.  The restrictive covenants contained within the PLL Defendants' Employment Agreement constitute an unconstitutional gag order.

10.     Aon's failure to pay Mr. Landa all of the compensation due to him constitutes a material breach of his Employment Agreement, which bars Aon's claims.

11.     Aon's failure to pay Mr. Landa all of the compensation due to him constitutes unclean hands.

12.     Aon's failure to pay Ms. Lugones all of the compensation due to her constitutes a material breach of her Employment Agreement and, therefore, bars Aon's claims.

13.     Aon's failure to pay Ms. Lugones all of the compensation due to her constitutes unclean hands.

14.     Aon is spreading false and defamatory information about the PLL Defendants in an attempt to destroy the PLL Defendants' reputations and tortiously interfere with their business relationships, which conduct constitutes unclean hands.

15.     Plaintiffs' claims are barred by the doctrine of unclean hands for, but not limited to, the following reasons: Plaintiffs and their employees have engaged in the same misconduct of which they accuse Defendants; Plaintiffs entered into now-failed merger negotiations which created an uncertain and adverse employment environment for Individual Defendants; as part of the now-failed merger, Plaintiffs required Individual Defendants to interview for positions they already held, cut employee support and resources necessary for Individual Defendants to adequately and successfully perform their jobs, and failed to provide Individual Defendants timely employment reviews and responses to compensation requests and inquiries; Plaintiffs used the pandemic as a pretext to make drastic and unjustified across-the-board salary reductions; Plaintiffs failed to pay Individual Defendants compensation that Plaintiffs were contractually, legally or morally obligated to pay.

16. By virtue of their own respective acts, Plaintiffs are estopped from recovering for alleged damages.

17. Plaintiffs' own actions or misconduct caused, in whole or in part, whatever damages they purport to have suffered. To the extent Plaintiffs are entitled to any recovery at all, any such recovery must be proportionately reduced by Plaintiffs' actions or misconduct.

18. If damaged (which Defendants vigorously deny), Plaintiffs have failed to make reasonable efforts to mitigate their damages.

19. Plaintiffs' alleged damages, if any, must be reduced and/or offset by amounts Plaintiffs owe Defendants.

20. Plaintiffs are not entitled to injunctive or declaratory relief because they have adequate remedies at law.

**JURY TRIAL:** The PLL Defendants hereby demand a trial by jury on all issues so triable.

[Remainder of Page Intentionally Blank]

## **DEFENDANT MICHAEL LANDA'S COUNTERCLAIM AGAINST PLAINTIFFS**

Defendant/Counter-Plaintiff Michael Landa hereby sues and counterclaims against Plaintiffs/Counter-Defendants, and states as follows:

1.     Michael Landa was employed by Aon Risk Services, Inc. of Florida ("ARS Florida") for over 25 years. At the time of his resignation, Mr. Landa was an Executive Vice President of ARS Florida.

2.     Mr. Landa's decision to resign was the culmination of many factors, including Aon's continued breaches of the agreements that are the subject of this counterclaim, Aon's unilateral reduction of Mr. Landa's salary in 2020 purportedly because of the pandemic, Aon's proposed merger with Willis Towers Watson, and the uncertainty the merger created at every level of the organization.

3.     Although Mr. Landa complied with all of his contractual obligations to Plaintiffs, the same cannot be said for Plaintiffs, who breached agreements with Mr. Landa to pay him for work on two special projects.

4.     The first was a project to retain and expand Aon's relationship with Entity 1,[1] and the second was to bring in business for Aon EMEA (Aon in Europe, Middle East, and Asia). Mr. Landa worked cooperatively on both of these projects across Aon's corporate boundaries to bring in additional revenue to Aon.

5.     In each instance, Aon agreed that Mr. Landa would receive specific compensation for such work because his contract provided only for incentive compensation based on revenues generated for ARS Florida, the Aon entity with whom he had an employment agreement.

---

[1]     Mr. Landa has not disclosed the client's name but will provide it to Plaintiffs.

6.      Aon made similar oral and written agreements to incentivize Mr. Landa and others to work across Aon corporate boundaries. For example, the Chief Financial Officer of Aon Reinsurance Solutions ("Aon Reinsurance"), proposed specific compensation for Mr. Landa's assistance to his group.

**The Reinsurance Project**

7.      Aon Benfield (an Aon reinsurance entity) engaged Mr. Landa to assist it in retaining and expanding Aon's reinsurance business with Entity 1.

8.      Emails between Mr. Landa and Aon Benfield CEO Eric Andersen confirm Mr. Landa's work on the Entity 1 Project, and his communications with Mr. Andersen as to the status of the project:

- On July 31, 2017, Mr. Landa wrote to Mr. Andersen that Bryon Ehrhart had asked Mr. Landa to assist with the Entity 1 relationship (Ex. 1);

- On September 4, 2017, Mr. Landa informed Mr. Andersen that "we have the [Entity 1] auto carve out" and Entity 1's "Affinity [business] is coming" (Ex. 2); and

- On September 15, 2017, Mr. Landa wrote Mr. Andersen: "Confirmed we're getting the lions [sic] share of [Entity 1] reinsurance . . . In addition to the auto carve out, property and affinity, were [sic] also getting construction book" (Ex. 3).

9.      When it became clear that the Entity 1 Project had been very successful, Aon Benfield CEO Andersen agreed with Mr. Landa that Aon would award to Mr. Landa an agreed-upon dollar amount of Aon stock on December 31, 2017, December 31, 2018, and December 31, 2019.

10.     However, Aon has not awarded any stock to Mr. Landa in compensation for his work on the Entity 1 Project, nor has it provided to him any other compensation for his work on that project. Mr. Andersen, who is now the CEO of Aon, acknowledged as much in June 2021,

when he met with Michael Parrish, raised the topic of Mr. Landa's work with Entity 1, and admitted that he (Aon) should have paid Mr. Landa.

**Project 2**

11.     Project 2 involved insurance for a huge construction project in Saudi Arabia. Mr. Landa worked with Aon employees in London and the United States, including Luigi Sturani, Eduardo Davila Quiroga, Geoffrey Heekin, and Robert Humphreys, to generate business relating to the construction project.

12.     Mr. Sturani, who was then the CEO of Aon EMEA (Aon Europe, Middle East, and Asia) confirmed in an email to Mr. Landa on May 4, 2018, that Mr. Landa would receive an agreed percentage of the year 1 recognized revenues and an agreed percentage of the recognized revenues in the following years. (Ex. 4)

13.     Despite the fact that Mr. Landa complied with all of his obligations, and Aon has recognized, and continues to recognize, revenues on Project 2, Aon has not paid any compensation to Mr. Landa.

**Mr. Landa's Employment Agreements**

14.     At the time of the Entity 1 Project and Project 2, Mr. Landa's Employment Agreement with ARS Florida was a 2001 Employment Agreement, which had been amended six times, with the last Amendment effective June 21, 2013, with a term ending on December 31, 2018. (Ex. 5[2]).

15.     Mr. Landa and ARS Florida entered into a subsequent Employment Agreement ("the 2019 Agreement") effective on January 1, 2019. (Ex. 6).

---

[2]      Mr. Landa does not currently have a copy of the First Amendment dated November 15, 2002.

16.     Mr. Landa's 2001 Employment Agreement defined "Aon" as including ARS Florida, "Aon Group, Inc., its subsidiaries and affiliates (and divisions thereof)". (Ex. 5 Section 4(a)). In the 2019 Employment Agreement, Aon Corporation, and Aon plc were added to the definition. (Section 4(a) of Ex. 6).

17.     The restrictive covenants in the 2001 and 2019 Employment Agreements define "Business" to include all of Aon's business worldwide, and they provide that Aon may enforce the restrictive covenants worldwide. As a result, although Mr. Landa was employed only by ARS Florida, the Plaintiffs in this action are ARS Florida, Aon Risk Services Companies, Inc., and Aon Group Inc. These entities include Aon Reinsurance and Aon EMEA, the Aon entities who received (and continue to receive) revenues generated by the Entity 1 Project and Project 2. Thus, at the same time Aon is breaching its contractual obligations to Mr. Landa, it is seeking to enforce the restrictive covenants in his Employment Agreement.

18.     Mr. Landa's Employment Agreements provide for an award of attorney's fees to a prevailing party. (Section 5 of Exs. 5 and 6).

19.     All conditions precedent to this action have occurred or been waived.

## Count 1
## Breach of the Employment Agreement as to the Entity 1 Project

20.     The allegations set forth in paragraphs 1–19 are incorporated as if set forth fully herein.

21.     Mr. Landa's 2001 Employment Agreement (as amended), was in effect when Mr. Landa worked with employees of Aon Reinsurance to retain and expand its business with Entity 1, and when Aon Benfields's CEO and Mr. Landa agreed upon the compensation Mr. Landa would receive for that work. The 2001 Employment Agreement expressly provided that Mr. Landa's

duties included the performance of duties and assignments from senior officers of Aon companies. (Ex. 5 Section 4B).

22.     Mr. Landa was engaged by Mr. Ehrhardt, Aon's Global Head of Strategic Growth and Development (and the former head of Aon Benfield), to assist Aon Benfield in retaining and expanding its Entity 1 reinsurance business.

23.     Aon Benfields's CEO, Mr. Andersen, agreed that Mr. Landa would be awarded Aon stock to compensate him for his work with Entity 1, as set forth above.

24.     Mr. Landa performed all of his contractual obligations.

25.     Aon breached its contractual obligations by failing to make the agreed-upon stock awards to Mr. Landa in December 2017, December 2018, and December 2019.

26.     Mr. Landa has suffered damages as a result of Aon's breach.

**WHEREFORE**, Mr. Landa is entitled to damages equal to the current value of the stock Aon agreed to award to him, as well as costs, attorney's fees, and all other relief the Court deems just and proper.

**Count 2**
**(In the Alternative to Count 1)**
**Breach of Oral Contract as to the Entity 1 Project**

27.     The allegations set forth in paragraphs 1–19 are incorporated as if set forth fully herein.

28.     Mr. Landa and Aon entered into a binding oral contract pursuant to which Mr. Landa assisted in retaining and expanding Entity 1's business with Aon and, in exchange, Aon agreed to award to Mr. Landa a definite and certain dollar amount of Aon stock.

29.     Mr. Landa fully performed his obligations under the contract.

30.     Aon breached the contract by failing to make the agreed-upon stock award to Mr. Landa.

31.     Mr. Landa has suffered damages as a result of Aon's breach.

**WHEREFORE**, Mr. Landa is entitled to damages equal to the current value of the stock Aon had agreed to award to Mr. Landa, costs and other relief the Court deems just and proper.

### Count 3
### (In the Alternative to Counts 1 and 2)
### Quantum Meruit as to the Entity 1 Project

32.     The allegations set forth in paragraphs 1, 4, 7–8, and 19 are incorporated as if set forth fully herein.

33.     Mr. Landa provided to Aon a benefit in the form of services—specifically, work to retain existing business and to secure new business from Entity 1.

34.     Aon assented to and received the benefit Mr. Landa provided.

35.     A reasonable person receiving the benefit Mr. Landa provided to Aon normally would expect to pay for it.

36.     Aon has not compensated Mr. Landa for the services he rendered—and the resulting benefit—to Aon.

**WHEREFORE**, Mr. Landa is entitled to an award of damages equal to the market value of the services performed or in the alternative, the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

**Count 4**
**(In the Alternative to Counts 1, 2, and 3)**
**Unjust Enrichment as to the Entity 1 Project**

37.     The allegations set forth in paragraphs 1, 4, 7–8, and 19 are incorporated as if set forth fully herein.

38.     Mr. Landa provided a benefit to Aon in the form of services—specifically, work to retain existing business and to secure new business from Entity 1.

39.     Aon voluntarily accepted and retained the benefit Mr. Landa provided.

40.     Aon has not compensated Mr. Landa for the services he rendered—and the resulting benefit—to Aon.

41.     It is inequitable for Aon to benefit from the provision of Mr. Landa's services without compensating him for the value of the benefit conferred.

**WHEREFORE**, Mr. Landa is entitled to the entry of a judgment in his favor that orders Aon to disgorge its ill-gotten gains to Mr. Landa, plus interest, costs, and all other relief the Court deems just and proper; or, in the alternative, an award of damages equal to the market value of the services performed or the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

**Count 5**
**Breach of the Employment Agreement as to Project 2**

42.     The allegations set forth in paragraphs 1–19 are incorporated as if set forth fully herein.

43.     Mr. Landa's 2001 Employment Agreement (as amended), was in effect at the time he worked with employees of Aon EMEA to bring in business relating to a construction project in Saudi Arabia, and at the time the Aon EMEA CEO and Mr. Landa agreed upon the compensation he would receive for that work. The 2001 Employment Agreement expressly provided that Mr.

Landa's duties included the performance of duties and assignments from senior officers of Aon companies. (Ex. 5 Section 4B).

44.     Mr. Landa was engaged by the Aon EMEA CEO to assist Aon EMEA in bringing in business relating to the Qiddiya construction project in, Saudi Arabia (aka Project 2).

45.     Mr. Landa complied, and assisted Aon EMEA in bringing in business relating to the Qiddiya construction project.

46.     Aon agreed to compensate Mr. Landa for this work, as set forth above.

47.     Aon breached the Employment Agreement by failing to make any of the agreed-upon payments to Mr. Landa.

48.     Mr. Landa has suffered damages as a result of Aon's breach.

**WHEREFORE**, Mr. Landa is entitled to monetary damages, plus interest, attorney's fees, costs, and all other relief the Court deems just and proper.

### Count 6
### (In the Alternative to Count 5)
### <u>Breach of Contract as to Project 2</u>

49.     The allegations set forth in paragraphs 1–19 are incorporated as if set forth fully herein.

50.     Mr. Landa and Aon entered into a binding contract pursuant to which Mr. Landa would assist on Project 2.

51.     Aon agreed to pay Mr. Landa for his work on Project 2, as set forth above.

52.     Mr. Landa fully performed his contractual obligations.

53.     Aon breached the contract by failing to pay Mr. Landa as agreed.

54.     Mr. Landa has suffered damages as a result of Aon's breach.

**WHEREFORE**, Mr. Landa is entitled to monetary damages, plus interest, costs, and all other relief the Court deems just and proper.

**Count 7**
**(In the Alternative to Counts 4, 5, and 6)**
**Quantum Meruit as to Project 2**

55.     The allegations set forth in paragraphs 1, 4, 11, 13, and 19 are incorporated as if set forth fully herein.

56.     Mr. Landa provided a benefit in the form of services—specifically, work to secure new business related to Project 2—to Aon.

57.     Aon assented to and received the benefit Mr. Landa provided.

58.     A reasonable person receiving the benefit Mr. Landa provided to Aon normally would expect to pay for it.

59.     Aon has not compensated Mr. Landa for the services he rendered—and the resulting benefit—to Aon.

**WHEREFORE**, Mr. Landa is entitled to an award of damages equal to the market value of the services performed or the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

**Count 8**
**(In the Alternative to Counts 5, 6, and 7)**
**Unjust Enrichment as to Project 2**

60.     The allegations set forth in paragraphs 1, 4, 11, 13, and 19 are incorporated as if set forth fully herein.

61.     Mr. Landa provided a benefit in the form of services—specifically, work to secure new business related to Project 2—to Aon.

62.     Aon voluntarily accepted and retained the benefit Mr. Landa provided.

63.     Aon has not compensated Mr. Landa for the services he rendered—and the resulting benefit—to Aon.

64.     It is inequitable for Aon to benefit from the provision of Mr. Landa's services without compensating Mr. Landa for the value of the benefit conferred.

**WHEREFORE**, Mr. Landa is entitled to the entry of a judgment in his favor that orders Aon to disgorge its ill-gotten gains to Mr. Landa, plus interest, costs, and all other relief the Court deems just and proper; or, in the alternative, an award of damages equal to the market value of the services performed or the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

**Count 9**
**(In the Alternative to Counts 1–8)**
**Unpaid Wages**

65.     The allegations set forth in paragraphs 1–19 are incorporated as if set forth fully herein.

66.     Mr. Landa and ARS Florida executed various Employment Agreements.

67.     In addition to his Employment Agreements, Mr. Landa entered into agreements with senior officers of Aon entities who agreed to pay Mr. Landa certain commissions.

68.     Mr. Landa performed all conditions of his Employment Agreements.

69.     Upon Mr. Landa's separation from employment with ARS Florida, ARS Florida owed Mr. Landa commissions for his services.

70.     Mr. Landa's commissions remain unpaid and due.

71.     Unpaid commissions are unpaid wages within the meaning of § 448.08, Florida Statutes.

72.     Pursuant to section 448.08, Florida Statutes, the prevailing party is entitled to recover the costs of the action and reasonable attorneys' fees from the non-prevailing party.

**WHEREFORE**, Mr. Landa demands judgment against ARS Florida for damages, including interest, attorneys' fees, costs, and all other relief the Court deems just and proper.

**JURY TRIAL:** Mr. Landa hereby demands a trial by jury on all issues so triable.

[Remainder of Page Blank]

## DEFENDANT GISELLE LUGONES'S COUNTERCLAIM AGAINST PLAINTIFF

Defendant/Counter-Plaintiff Giselle Lugones hereby sues and counterclaims against Plaintiff/Counter-Defendant Aon Risk Services, Inc. of Florida ("Aon" or "ARS Florida"), and states as follows:

### General Allegations

1.      Giselle Lugones is an insurance broker specializing in the healthcare industry. She works with hospitals, physician groups, and other healthcare entities to manage and insure the unique risks they face. Many of her clients are non-profit entities.

2.      Ms. Lugones was an ARS Florida employee for over 25 years. She resigned from ARS Florida in early June 2021, and left ARS Florida's employment in July 2021. Her decision to leave ARS Florida was prompted by several factors including ARS Florida's unilateral reduction in her salary in 2020 (a breach of her Employment Agreement), and the uncertainty caused by the planned merger with Willis Towers Watson.

3.      Ms. Lugones's Employment Agreement with Aon included incentive compensation tied to business she generated (Ex. 1).

4.      Prior to leaving Aon, Ms. Lugones was actively working to bring a new customer to Aon: Entity A,[3] which is a large physician-owned and physician-led acute-care medical groups in the United States.

5.      After Ms. Lugones announced her resignation, Aon required Ms. Lugones to remain employed for 45 days pursuant to a minimum-notice provision in the Employment Agreement.

---

[3]      Ms. Lugones has not disclosed the client's name in but will provide it to Plaintiffs.

6.      Before her resignation became effective, Ms. Lugones actively assisted other Aon personnel in their efforts to acquire Entity A's business, and, as a result, Aon was successful in bringing in Entity A as a new client (i.e., the deal closed).

7.      Pursuant to her Employment Agreement, Ms. Lugones is entitled to incentive compensation she earned for bringing in Entity A as a new client to Aon.

8.      After Ms. Lugones's employment at Aon ended, Ms. Lugones asked Aon to pay her the incentive payment due to her, but Aon refused.

9.      Aon's failure to pay Ms. Lugones the incentive payment she is owed is a breach of her Employment Agreement.

10.      The Employment Agreement provides for an award of attorney's fees to the prevailing party.

11.      All conditions precedent to this action have occurred or been waived.

**Count 1**
**Breach of Contract**

12.      The allegations set forth in paragraphs 1–11 are incorporated as if set forth fully herein.

13.      Ms. Lugones's employment with Aon was governed by the Employment Agreement.

14.      The Employment Agreement entitled Ms. Lugones to incentive compensation for bringing in Entity A as a new client to Aon.

15.      Aon failed to pay Ms. Lugones the incentive compensation she is entitled to under the Employment Agreement and thereby breached the Employment Agreement.

16.      Ms. Lugones has suffered damages as a result of Aon's breach.

**WHEREFORE**, Ms. Lugones is entitled to damages equal to the amount of incentive compensation she is entitled to pursuant to the terms of her Employment Agreement, as well as interest, costs, attorney's fees, and all other relief the Court deems just and proper.

### Count 2
### (In the Alternative to Count 1)
### Quantum Meruit

17.     The allegations set forth in paragraphs 1, 4, 6, 8, and 11 are incorporated as if set forth fully herein.

18.     Ms. Lugones provided a benefit in the form of services—specifically, work to secure new business from Entity A—to Aon.

19.     Aon assented to and received the benefit Ms. Lugones provided.

20.     A reasonable person receiving the benefit Ms. Lugones provided to Aon normally would expect to pay for it.

21.     Aon has not compensated Ms. Lugones for the services she rendered—and the resulting benefit—to Aon.

**WHEREFORE**, Ms. Lugones is entitled to an award of damages equal to the market value of the services performed or the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

### Count 3
### (In the Alternative to Counts 1 and 2)
### Unjust Enrichment

22.     The allegations set forth in paragraphs 1, 4, 6, 8, and 11 are incorporated as if set forth fully herein.

23.     Ms. Lugones provided a benefit in the form of services—specifically, work to secure new business from Entity A—to Aon.

24.     Aon voluntarily accepted and retained the benefit Ms. Lugones provided.

25.     Aon has not compensated Ms. Lugones for the services she rendered—and the resulting benefit—to Aon.

26.     It is inequitable for Aon to benefit from the provision of Ms. Lugones's services without compensating Ms. Lugones for the value of the benefit conferred.

**WHEREFORE**, Ms. Lugones is entitled to the entry of a judgment in her favor that orders Aon to disgorge its ill-gotten gains to Ms. Lugones, plus interest, costs, and all other relief the Court deems just and proper; or, in the alternative, an award of damages equal to the market value of the services performed or the value of the services to Aon, as well as interest and costs, along with all other relief the Court deems just and proper.

### Count 4
### (In the Alternative to Counts 1–3)
### <u>Unpaid Wages</u>

1.     The allegations set forth in paragraphs 1–11 are incorporated as if set forth fully herein.

2.     Ms. Lugones and ARS Florida executed an Employment Agreement.

3.     Ms. Lugones performed all conditions of her Employment Agreement.

4.     Upon Ms. Lugones's separation from her employment with ARS Florida, ARS Florida owed Ms. Lugones a commission for her services.

5.     Ms. Lugones's commission remains unpaid and due.

6.     Unpaid commissions are unpaid wages within the meaning of § 448.08, Florida Statutes.

7.      Pursuant to section 448.08, Florida Statutes, the prevailing party for unpaid wages is entitled to recover the costs of the action and reasonable attorneys' fees from the non-prevailing party.

**WHEREFORE**, Ms. Lugones demands judgment against ARS Florida for damages, including interest, attorneys' fees, costs, and all other relief the Court deems just and proper.

**JURY TRIAL:** Ms. Lugones hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Steven J. Brodie*
CARLTON FIELDS, P.A.

Steven J. Brodie, Esq.
2 MiamiCentral
700 NW 1st Avenue, Ste. 1200
Miami, Florida 33136
Telephone: 305-539-7302
Fax: 305-530-0055
sbrodie@carltonfields.com

Nancy J. Faggianelli, Esq.
David R. Wright, Esq.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607
Telephone: 813-223-7000
Fax: 813-229-4133
nfaggianelli@carltonfields.com
dwright@carltonfields.com

*Counsel for Defendants Michael Parrish, Giselle Lugones, and Michael Landa*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed through the Florida E-Portal, which will cause a true and correct copy thereof to be served on all counsel of record and the CBL email service address for Section 44, on this 14th day of October, 2021. In addition, a copy of the foregoing was served in on the same day to CBL44DOCS@jud11.flcourts.org, consistent with the Court's Additional Instructions on the Court's webpage.

<u>/s/ Steven J. Brodie</u>
Counsel

# EXHIBIT 1

On Jul 31, 2017, at 8:01 AM, Michael Landa <michael.███████████
wrote:

> Eric, good catching up last week.
> Quick recap;
> ██████████ asked me to assist with ███ relationship
> regarding property renewal.
> Spoke to ████████ and peripherally with ██████████.
> Since █████ came over to ███, they have adopted a
> mindset of buying more reinsurance limits(additional
> property and buy down of deductibles).
> In addition, we have now have the auto carve out info
> (new business)and soon to be discussing the ███████
> business.
> Look forward to the follow up call, after you've had a
> chance to review and get up to speed on this.
> Just an FYI, I'm having dinner with ███ and ███ on the
> 16th.
>
> Regards
> Michael

# EXHIBIT 2

**From:** Michael Landa <michael.
**Date:** September 4, 2017 at 7:44:16 AM PDT
**To:** Eric Andersen <eric.
**Subject: Re:**

I know we have the auto carve out
■■■■■ is coming
Additional property limits and deductible buy downs.
He gave ■■■ the financial lines(he wants to be on our panel, but couldn't get on- I spoke to ■■■
and ■■■ about it).
What other lines did you hear about?

Michael Landa
Executive Vice President
Aon risk solutions
2875 NE 191st street
PH 2A
Aventura, Florida 33180
Office-        0102
Cel-        -2228
Fax-        4863

# EXHIBIT 3

> On Sep 15, 2017, at 10:33 AM, Michael Landa <michael.█████████ wrote:
>
> Confirmed that we're getting lions share of ███ reinsurance.
> Saw █████ and asked again about getting ███ on panel. This is a major deal for ███.
> In addition to auto carve out , property  and █████, were also getting construction book.
> Let's connect when you're back.
> On the lighter side of things, I was at ██████ yesterday and saw Peter. Great guy!!!!
> Regards
> Michael
>
> Michael Landa
> Executive Vice President
> Aon risk solutions
> 2875 NE 191st street
> PH 2A
> Aventura, Florida 33180
> Office-████████0102
> Cel-█████2228
> Fax-█████4863

# EXHIBIT 4

**From:** Luigi Sturani <luigi. ███████████>
**Date:** May 4, 2018 at 9:24:50 AM EDT
**To:** Michael Landa <michael. ███████████>
**Cc:** Eduardo Dávila Quiroga <eduardo. ███████████ Geoffrey Heekin <geoffrey.l███████████, Robert Humphreys <robert.l███████████
**Subject: RE: Saudi**

Hi Michael,

We are finally good to go! The agreement will be that we will pay ██% of the year 1 recognised revenues and ██% of recognised revenues in the following years.

Now we have no excuses for not to win this account!

I hope to see you soon in London or somewhere in the US soon.

All the best

Luigi

# EXHIBIT 5

# EMPLOYMENT AGREEMENT

**EMPLOYMENT AGREEMENT** ("Agreement") dated as of January 1, 2001 (the "Effective Date") between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive, Miami, Florida (the "Company"), and Michael Landa, residing at 9418 W. Broadview Drive, Bay Harbor, Florida (the "Employee").

# RECITALS

WHEREAS, the Company wishes to employ the Employee, and the Employee wishes to be employed by the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the parties agree:

**Section 1.    Employment Title and Term.**

The Company agrees to employ the Employee as senior vice-president and the Employee agrees to serve in such executive capacity with the duties set forth in Section 4 for a term (the "Term of Employment") beginning on January 1, 2001, and ending on December 31, 2005, unless renewed pursuant to Section 3 hereof, or terminated during the Term of Employment as fully set forth in Section 3.

**Section 2.    Consideration; Compensation During Term of Employment.**

(a)    **Consideration.**  The consideration for entering into this Agreement shall be the performance of services by the Employee pursuant to this Agreement and the employment of the Employee by the Company as well as the other payments and benefits provided under this Section 2.

(b)    **Salary and Compensation.**

    (i)    For each of the first three calendar years of the Term, Employee shall be paid an annual base salary (the "First Base Salary") of ▒▒▒▒▒ payable in ▒▒ equal installments every two weeks pursuant to the Company's normal payroll practices and procedures.

    (ii)    For each six-month period of the Term, such periods ending on each June 30 and December 31, Employee shall be entitled to receive as compensation amounts based upon New Business Revenue, as defined below, generated for Aon Risk Services Companies, Inc., including its subsidiaries (hereafter "ARS") from each new client or customer or each new line produced by Employee during such six-month period (the "Bonus"), as follows: 1) ▒▒▒▒ of New Business Revenue which is new recurring business and 2) ▒▒▒▒ of New Business Revenue which is new

non-recurring business.  Payment of the Bonus shall be made in cash within 45 days after the end of each June 30 and December 31 of the Term, except that the initial payment for the six-month period ending June 30, 2001, shall be the later of 45 days after June 30, 2001, or 45 days after full execution of this Agreement.

(iii)  For calendar year 2004, Employee shall be paid annually ▮▮ of his Book of Business, as defined below, for 2003 and for calendar year 2005, Employee shall be paid annually ▮▮ of his Book of Business for 2004 (the "Second Base Salary");

The Second Base Salary shall be payable in equal installments every two weeks during each calendar year, in accordance with the Company's normal payroll practices and procedures.

(iv)  As used in this Agreement, the term "Book of Business" shall mean the gross annual fees and commissions, or, where revenue is in the form of premium, commission-equivalents, on business produced by the Employee for ARS and accrued, in accordance with past practice, during the preceding twelve (12) month period (provided, however, that in the event that collection on an account is in arrears by 180 days or more at the time of the calculation of the Book of Business for the calendar year, the Book of Business shall be adjusted as to that account to mean business produced for ARS and collected during the designated period), except for direct billed accounts which will be recognized on a cash basis, less Surplus Lines taxes and/or stamping fees, and third party sub-brokerage and co-brokerage payments, and adjusted for audits, additions and returns.  For multi-year insurance arrangements and placements only that portion of fees, commissions and commission-equivalents as would be accounted for in accordance with the ARS then-existing income recognition policy, shall be included in calculating the Book of Business.

(v)  As used in this Agreement, "New Business Revenue" (also referred to as "New Business) shall mean the gross annual fees and commissions, or, where revenue is in the form of premiums, commission equivalents, on business produced by the Employee and collected by ARS as well as fees paid on non-recurring business in accordance with ARS income recognition policy during each calendar year, less surplus lines taxes and/or stamping fees, and sub-brokerage and co-brokerage payments, from clients or customers not reflected on the books of ARS as a client or customer of Employee on December 31 of each prior calendar year or from new lines of revenues from existing clients or customers of Employee as reflected on the books of the Company or any of its affiliates.

(c)  **Stock Options.**  No later than April 20, 2001, the Chief Executive Officer of the Company shall request the Organization and Compensation Committee of the Board of Directors of Aon Corporation ("Aon") to grant Employee an incentive stock option to purchase ▮▮▮▮

2

shares of Aon common stock (the "Option"). Said Options shall be granted pursuant to the terms and conditions of the Aon Stock Incentive Plan (the "Plan"), as amended from time to time.

The Options shall vest in accordance with the Plan's vesting provisions, except that, in the event of the termination by the Company of Employee's employment without cause (as defined in Section 3(ii)) vesting shall continue after termination of employment to the same extent as if the Employee had continued employment without termination. The Options shall cease to vest (either before or after termination of employment) in the event the Employee fails to comply with the provisions of Sections 4(d) and 4(e) and 6 herein and notwithstanding the expiration of the period specified therein.

      (d)    **Fringe Benefits.** During the course of employment, the Employee shall enjoy the customary benefits which are generally afforded to employees of the Company. The Employee also shall be entitled to participate in employee benefit plans now or hereafter provided or made available to the Company's employees generally, such as group medical, life, disability insurance, pension plan, flexible spending accounts for dependent care and health care and long term care. Nothing in this Agreement shall require the Company to establish, maintain or continue any of the benefits already in existence or hereafter adopted for employees of the Company and nothing in this Agreement shall restrict the right of the Company to amend, modify or terminate such fringe benefit programs.

      (e)    **Vacation Time.** The Employee shall be entitled to paid vacation time in accordance with usual Company policies and procedures. The Company shall not pay the Employee any additional compensation for any vacation time not used by the Employee except as required by law.

      (f)    **Business Travel, Entertainment Expenses.** In accordance with Company policies and procedures and on prescribed Company forms, the Company will reimburse the Employee for business expenses and entertainment expenses incurred by the Employee.

      Section 3.    **Termination.**

    (a)    **Termination.**

        (i)    **Death or Disability.** This Agreement shall be terminated immediately upon the death or total disability (as defined under the Aon Long Term Disability Plan or its successor plan) of Employee; provided, however, (A) in the event of Employee's death during the Term of Employment the Company shall pay an amount equal to either the First Base Salary or the Second Base Salary, as applicable at the time of death, for the remainder of the Term of Employment in accordance with the Company's normal payroll schedule, which such amount shall be reduced by the amount of life insurance benefits payable to the beneficiary of Employee pursuant to Company-sponsored life insurance coverages and (B) in the event of Employee's total disability an amount equal to the First Base Salary or the Second Base Salary, as applicable at the time of disability, shall be paid for the remainder of the Term of Employment in accordance with the

3

Company's normal payroll schedule, which such amount shall be reduced by the amount of disability insurance benefits payable to Employee pursuant to Company-sponsored disability insurance coverages, plus, in either case, the Bonus, on a pro rata basis from the first day of the calendar year until the date of death or total disability.

(ii) **Without Cause.** This Agreement may be terminated by the Company or the Employee without cause on no less than ninety (90) days advance notice (the "Notice Period"). If terminated without cause by the Company the Company shall (A) continue to pay Employee an amount equal to the Base Salary (either First or Second, as applicable) as and when it would otherwise have been paid from the date of termination until the end of the Term of Employment (B) pay Employee all accrued but unpaid benefits as of the date of such termination, (C) pay the Bonus, on a pro rata basis from the first day of the calendar year until the conclusion of the Notice Period as set forth above and (D) cause all unvested Options to continue to vest, and allow Employee to continue to exercise such Options, so long as Employee does not breach the provisions of Sections 4(d) and 4(e) herein notwithstanding the expiration of the period specified therein.

Notwithstanding anything to the contrary in the foregoing paragraph, the Company may require Employee to leave Company premises immediately upon the giving of notice. Such a requirement shall not relieve the Company of its obligations to continue Base Salary (First or Second, as applicable) or benefits during the Notice Period.

In the event Employee terminates this Agreement without cause, the Company shall be required to pay Employee all accrued but unpaid Base Salary (First or Second, as applicable) and other compensation as applicable (including the Bonus), on a pro rata basis, and benefits as of the date of such termination,

(iii) **For Cause.** The Company may at any time during the Term of Employment and during any renewals thereof, terminate this Agreement for "cause", by written notice of termination given to the Employee setting forth the basis for such termination. For the purposes of this Agreement, "cause" shall mean the Employee's (A) performing an act of dishonesty, fraud, theft, embezzlement, or misappropriation involving Employee's employment with the Company, (B) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after reasonable investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and/or Employee by a court, arbitration panel or similar tribunal, (C) a material violation of Company written policies and procedures distributed to the Employee including, but not limited to, the Aon Business Conduct Guidelines and the Aon Code of Ethics which subject employees generally to termination of employment, (D) material non-compliance with the

4

terms of this Agreement, including but not limited to Sections 4 and 6 hereunder, (E) a criminal felony conviction or guilty plea to a felony of Employee or (F) any refusal by the Employee to follow specific directives of the Chief Executive Officer of the Company (or such other senior officer of the Company or an affiliate of the Company to whom Employee is required to report), where such directions are consistent with the experience and qualifications of Employee.

Notwithstanding anything to the contrary, with respect to an action or omission described in(C), (D), or (F), (a "Deficiency"), the Company must first provide to Employee written notice of the Deficiency and then give Employee a five business day period to cure said Deficiency prior to terminating Employee's employment hereunder. If the Deficiency is cured prior to the end of such five business day period, then the Company shall not have the right to terminate Employee due to such Deficiency. If the Deficiency is incapable of being cured during such period, then for so long as Employee is diligently pursuing a cure (but not to exceed 20 days from the date of notice of the Deficiency), the Company shall not have the right to terminate Employee due to such Deficiency.

In the event of a termination for "cause," the Company shall only be required to pay Employee all accrued but unpaid Base Salary (First or Second, as applicable), and or other compensation as applicable, including the Bonus on a pro rata basis, as well as all other benefits through the date of such termination.

(iv)    As of the effective date of termination, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of the Company and its subsidiaries and affiliates. Upon the effective date of termination, the obligations of the parties under this Agreement, other than the Employee's obligations under Sections 3(b), 4, 5 and 6, and the Company's obligations under Sections 3(a)(i) through (iii), shall cease.

(v)    Any agreement herein by the Company to continue to pay Base Salary or any other benefits after the termination of employment shall be in lieu of, and not in addition to, any benefits provided by the Aon Severance Plan.

(b)    The Employee agrees that, prior to the commencement of any new employment in the insurance business, the Employee will furnish the prospective new employer with a copy of this Agreement. The Employee also agrees that the Company may advise any prospective new employer of the Employee of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

Section 4.    **Recitals; Duties; Covenant Not To Compete.**

5

(a)    **Recitals.**   Aon Group, Inc., a Maryland corporation with its executive headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company (collectively "Aon Group") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting human resources consulting, managing underwriting and related insurance services, including accounting, claims management and handling, contract wording, information systems and actuarial (the "Business") as well as soliciting and servicing the insurance and reinsurance needs of numerous commercial and individual clients which are national and international and are not confined to any geographic area. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients. Because of these contacts and relationships, it is common for Aon Group's clients to develop an identification with the employee who serves its insurance needs rather than with Aon Group itself. Aon Group, however, invests considerable time and money necessary for a relationship between its employee and a client to develop and be maintained, in that Aon Group pays the employee's salary and reimburses the employee for business expenses. Aon Group also assists its employees in servicing clients by making available to these employees legal advice, accounting support, advertising and other corporate services.

The personal identification of clients of Aon Group with an Aon Group employee creates the potential for the employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon Group. Since Aon Group would suffer irreparable harm if an employee left the Company's employ and solicited the insurance or other related business of clients of the Company and Aon Group, it is reasonable to protect the Company and Aon Group against solicitation activities by an employee for a limited period of time after an employee leaves the Company so that Aon Group may renew or restore its business relationship with its clients.

The Company and the Employee acknowledge and agree that the covenant contained in Sections 4(d) and (e) below is reasonably necessary for the protection of the Company and Aon Group and is reasonably limited with respect to the activities it prohibits, its duration (particularly in the context of annual and multi-year insurance renewal periods), its geographical scope and its effect on the Employee and the public. The parties acknowledge that the purpose and effect of the covenant simply is to protect the Company and Aon Group for a limited period of time from unfair competition by the Employee.

(b)    **Duties.**   The Employee agrees during the course of employment to solicit, handle business for, sell insurance or render services related to the Business as agent of the Company and to perform such other duties and assignments relating to the Business as the Chief Executive Officer of the Company (or such other senior officer of the Company or an affiliate of the Company to whom Employee is required to report) directs, except that the Employee shall not be required to perform any duty or assignment inconsistent with the Employee's experience and qualifications. Employee will be based in Dade County, Florida.

(c)    **Exclusivity.**   During the course of employment the Employee shall, except during customary vacation periods and periods of illness, devote his entire business time and attention to the performance of the duties hereunder and to promoting the best interests of the Company.

C:\windows\TEMP\LahdaEmptAgmt701.doc

The Employee shall not, either during or outside of normal business hours, directly or indirectly, engage in any aspect of the insurance or risk management business for or on behalf of any entity other than the Company, nor intentionally engage in any activity inimical to the best interests of the Company. Nothing contained herein shall prevent Employee from making passive investments in business entities or transactions.

(d) **Covenant Not to Compete.** The Employee hereby covenants and agrees that, except with the prior written consent of the Company, the Employee will not, for the longer of (i) two (2) years after the end of employment, or (ii) two (2) years after the end of the Term of Employment, compete directly or indirectly in any way with the Business. For the purposes of this Agreement, "compete directly or indirectly in any way with the Business" means to enter into or attempt to enter into (on Employee's own behalf or on behalf of any other person or entity) any business relationship of the same type or kind as the business relationship which exists between Aon Group and its clients or customers to provide services related to the Business for any individual, partnership, corporation, association or other entity who or which was a client or customer for whom the Employee was the producer or on whose account Employee worked or became familiar as a result of his employment during the twenty-four (24) months prior to the end of employment. "Client" or "customer" means any person or entity listed on the books of Aon Group as such.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients and customers of Aon Group.

Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for himself or his family by being engaged in the insurance business. The intent of the parties is that the restrictive covenant of non-competition by the Employee is limited to those clients and customers of Aon Group for whom the Employee was the producer or on whose account Employee worked or became familiar as a result of his employment, during the twenty-four (24) months prior to the end of the Employee's employment with the Company.

(e) **Covenant Not to Hire.** The Employee hereby also agrees not to induce or attempt to induce, or to cause any person or other entity to induce or attempt to induce, any person who is known by Executive to be an employee of Aon Group to leave the employ of Aon Group during the term of the covenant set forth herein.

Section 5.    **Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 4 and 6 of this Agreement will result in irreparable and continuing harm to the Company or Aon Group, or both, and that therefore, in addition to any other remedy which the Company or Aon Group, or both, may have at law or in equity, the Company and Aon Group shall be entitled to injunctive relief for a breach of this Agreement by the Employee. In the event that any action

7

is filed in relation to this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees.

### Section 6.  Trade Secrets and Confidential Information.

(a)  The Employee acknowledges that the Company's and Aon Group's business depend to a significant degree upon the possession of information which is not generally known to others, and that the profitability of the business of the Company and Aon Group requires that this information remain proprietary to the Company and Aon Group.

(b)  The Employee shall not, except as required in the course of employment by the Company, disclose or use during or subsequent to his employment hereunder, any Trade Secrets or Confidential or Proprietary Information, as defined below, relating to the Business of the Company or Aon Group of which the Employee becomes aware by reason of being employed by the Company or to which Employee gains access during his employment by the Company and which has not been publicly disclosed (other than by Employee in breach of this provision).  For purposes of this Agreement, Trade Secrets, or Confidential or Proprietary Information shall include client and customer lists, data, records, computer programs, manuals, processes, methods and intangible rights which are either developed by the Employee during the course of employment or to which the Employee has access.  All records and equipment and other materials relating in any way to such Trade Secrets or Confidential or Proprietary Information relating to clients or to the Business of the Company or Aon Group shall be and remain the sole property of the Company and Aon Group during and after the end of employment.

(c)  Upon termination of employment, the Employee shall promptly return to the Company all materials and all copies or tangible embodiments of materials involving any Trade Secrets or Confidential or Proprietary Information in the Employee's possession or control.  The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 6.

### Section 7.  Mergers and Consolidations; Assignability.

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 7 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred.  This Agreement shall not be assignable by the Employee, but in the event of his death it shall be binding upon and inure to the benefit of the Employee's legal representatives to the extent required to effectuate its terms.

### Section 8.  Miscellaneous.

8

(a) **Integration.** Except as is otherwise provided herein, this Agreement contains all of the terms and conditions agreed upon by the parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, respecting the subject matter of this Agreement.

This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Waiver.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing.

(c) **Captions.** The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(d) **Arbitration.** Except for a dispute arising in relation to the provisions of Sections 4 and 6 herein, any dispute between Employee and the Company concerning the employment of the Employee by the Company or terms of this Agreement, including whether a breach has occurred, will be settled by arbitration and will be governed by the rules and procedures set forth below:

    (i) *Governing Law.* Notwithstanding any other choice of law provisions in the Agreement, the interpretation and enforcement of the arbitration provisions of this Agreement shall be governed exclusively by the Federal Arbitration Act, ("FAA"), 9 U.S.C. 1 et seq., provided that they are enforceable under the FAA, and shall otherwise be governed by the law of the State of Florida without regard to conflict of law principles.

    (ii) *Scope of Arbitration.* Except as provided below, the parties agree to submit to arbitration, in accordance with these provisions, any and all disputes arising from or related to the employment relationship created by this Agreement and any other disputes between the parties arising from or related to their employment relationship and alleging common law tort violations or violations of state or federal statutory rights. The parties further agree that the arbitration process agreed upon herein shall be the exclusive means for resolving all disputes made subject to arbitration herein and that the decision of the arbitrator shall be final and binding and may be entered in any court of competent jurisdiction.

    (iii) *Time Limits on Submitting Disputes.* The parties agree and understand that one of the objectives of this arbitration agreement is to resolve disputes expeditiously as well as fairly, and that it is the obligation of both parties, to those ends, to raise any disputes subject to arbitration hereunder in an expeditious manner. Accordingly, the parties agree to waive all

9

statutes of limitations that might otherwise be applicable and agree further that, as to any dispute that can be brought hereunder, a demand for arbitration must be postmarked or delivered in person to the other party no later than one (1) year after the dispute arises. In the absence of a timely submitted written demand for arbitration, an arbitrator has no authority to resolve the disputes or render an award and no arbitrator has authority hereunder to determine the timeliness of an arbitration demand.

*(iv)*    *Availability of Provisional Relief.* These arbitration provisions shall not prevent the Company or the Employee, as the case may be, from obtaining relief from a court of competent jurisdiction to enforce the obligations of Sections 4 or 6 of the Agreement.

*(v)*    *American Arbitration Association Rules Apply as Modified Herein.* Any arbitration hereunder shall be conducted under the Model Employment Procedures of the American Arbitration Association ("AAA"), as modified herein.

*(vi)*    *Invoking Arbitration.* Either party may invoke the arbitration procedures described herein, by submitting to the other, in person or by mail, a written demand for arbitration, containing a statement of the matter to be arbitrated sufficient to establish the timeliness of the demand. The parties shall then have fourteen (14) days within which they may identify a mutually agreeable arbitrator. After the fourteen (14) day period has expired, the parties shall prepare and submit to the American Arbitration Association a joint submission, with the Company paying the appropriate administrative fee. In their submission to the AAA, the parties shall either designate a mutually acceptable arbitrator or request a panel of arbitrators from the AAA according to the procedure described in (g) below.

*(vii)*    *Arbitrator Selection.* In the event the parties cannot agree upon an arbitrator within fourteen days after the demand for arbitration is received, their joint submission to the AAA shall request a panel of nine (9) arbitrators who are practicing attorneys with professional experience in the field of labor and/or employment law, and the parties shall attempt to select an arbitrator from the panel according to AAA procedures. In the event that the parties are unsuccessful, they shall request a second panel of nine comparably qualified arbitrators and repeat the selection process. If the parties remain unable to select an arbitrator, then they shall request from AAA a third panel of three comparably qualified arbitrators, from which the AAA shall reject the least preferred candidate of each party, and select the candidate with the highest joint ranking of the parties.

In the event of the death or disability of an arbitrator, the parties shall select a new arbitrator as provided above. The substitute arbitrator shall have the power to determine the extent to which he or she shall act on the record already made in arbitration.

10

C:\windows\TEMP\LandaEmptAgmt701.doc

(viii) *Prehearing Procedures.* In order to achieve the objectives of a just, fair, and expeditious resolution of the dispute, the arbitrator may either, upon accepting assignment as arbitrator, (i) promptly conduct a preliminary hearing or (ii) require the submission of written statements, or both, in which event, each party shall be entitled to make a brief statement of their respective positions, and at which time the arbitrator shall establish a timetable for prehearing activities and the conduct of the hearing, and may address initial requests from the parties for prehearing disclosure of information. At the preliminary hearing and/or thereafter, arbitrator shall have the discretion and authority to order, upon request or otherwise, the prehearing disclosure of information to the parties, including, without limitation, production of requested documents, exchange of witness lists and summaries of the testimony of proposed witnesses, and examination by deposition of potential witnesses. Pursuant to these same objectives, the arbitrator shall have the authority, upon request or otherwise, to conference with the parties of their designated representatives concerning any matter, and to set or modify timetables for all aspects of the arbitration proceeding.

(ix) *Stenographic Record.* There shall be a stenographic record of the arbitration hearing, unless the parties agree to record the proceedings by other reliable means. The costs of recording the proceedings shall be borne by the Company.

(x) *Location.* Unless otherwise agreed by the parties, arbitration hearings shall take place in the city and state where the office of the Company is located in which the Employee was primarily employed during the term of the Agreement, at a place designated by the AAA.

(xi) *Posthearing Briefs.* After the close of the arbitration hearing, and on any issue concerning prehearing procedures, the arbitrator may allow the parties to submit written briefs.

(xii) *Confidentiality.* All arbitration proceedings hereunder shall be confidential. Neither party shall disclose any information about the evidence adduced by the other in the arbitration proceeding or about documents produced by the other in connection with the proceeding, except in the course of a judicial, regulatory, or arbitration proceeding, or as may be requested by governmental authority or legal process. Before making any disclosure permitted by the preceding sentence, the party shall give the other party reasonable (under the circumstances) written notice of the intended disclosure and an opportunity to protect its interests. Expert witnesses and stenographic reports shall be requested to sign appropriate nondisclosure agreements.

11

(xiii)  *Costs.*  All expenses of such arbitration, including but not limited to the Employee's reasonable legal fees and disbursements, shall be borne by the Company unless the arbitrators determine that Employee's position was frivolous or taken in bad faith (in which case Employee shall bear his own legal fees and disbursements) and the Parties shall equally divide the costs of the arbitration and the AAA.

(xiv)  *Remedies.*  The arbitrator shall have authority to award any remedy or relief that a court of the State of Florida could grant in conformity to applicable law, except that the arbitrator shall have no authority to award attorneys' fees (except as provided in the Agreement) or punitive damages, can suggest but not order reinstatement.

(xv)  *Law Governing the Arbitrator's Award.*  In rendering an award, the arbitrator shall determine the rights and obligations of the parties according to federal law and the substantive law of the State of Florida (excluding conflicts of laws principles), and the arbitrator's decision shall be governed by state and federal substantive law, including state and federal discrimination laws, as though the matter were before a court of law.

(xvi)  *Written Awards and Enforcement.*  Any arbitration award shall be accompanied by a written statement containing a summary of the issues in controversy, a description of the award, and an explanation of the reasons for the award.  The parties agree that a competent court shall enter judgment upon the award of the arbitrator, provided it is in conformity with the terms of this Agreement.

(xvii)  *Disclaimer of Employment Rights.*  It is understood and agreed by the parties that the provisions in this Section concerning arbitration do not contain, and cannot be relied upon by the Employee to contain, any promises or representations concerning the duration of the employment relationship, or the circumstances under or procedures by which the employment relationship may be terminated.

(e)  **Governing Law and Venue.**  The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Florida, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  Subject to Section 8(d) herein, venue for all actions or proceedings arising out of or relating to this Agreement shall be in the State or Federal Courts located in Miami-Dade, Florida.

(e)  **Agreement To Be Available In Future Proceedings.**  During the period of employment, and after employment termination, Employee agrees to voluntarily make himself available to the Company and its legal counsel at his then current residence, at Company's request and at reasonable times and upon reasonable notice, without the necessity of obtaining a

12

C:\windows\TEMP\LandaEmptAgmt701.doc

subpoena or court order, in the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. Employee agrees to provide any information reasonably within his recollection. The Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at Company's option, will arrange to advance Employee's expenses or incur such expenses directly.

(f)     **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company and Aon Group the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(g)     **Notice.**  All notices given hereunder shall be in writing and shall be sent by registered or certified mail or delivered by hand and, if intended for the Company, shall be addressed to it or delivered to it at its principal office for the attention of the Secretary of the Company.   If intended for the Employee, notices shall be delivered personally or shall be addressed (if sent by registered or certified mail) to the Employee's then current residence address as shown on the Company's records, or to such other address as the Employee directs in a notice to the Company.   All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

(h)     **No Mitigation.**  In the event that Employee's employment hereunder is terminated pursuant to Section 3(iii) and such termination is found, pursuant to arbitration as herein provided, to breach this Agreement, damages shall be assessed without regard to Employee's mitigation of or failure to mitigate his damages.

(h)    **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

AON RISK SERVICES, INC. OF FLORIDA

By:_____
     Skip Dunn
     Vice Chairman

Dated:_____

AON RISK SERVICES COMPANIES, INC.

By:_____
     Richard Barry
     Vice President

I have read the above Agreement and understand and agree to be bound by its terms.

_____
MICHAEL LANDA

Dated: 7/25/01

14

C:\windows\TEMP\~0035326.doc

## AMENDMENT NO. 2 TO EMPLOYMENT AGREEMENT

THIS AMENDMENT NO. 2 TO EMPLOYMENT AGREEMENT ("Amendment Two"), dated as of December 1, 2003 (the "Amendment Two Effective Date"), by and between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive, Miami, Florida (the "Employer"), and Michael Landa, residing at 9418 W. Broadview Drive, Bay Harbor, Florida (the "Employee").

WHEREAS, the Employer and the Employee entered into that certain Employment Agreement dated January 1, 2001, as amended November 15, 2002 (together, the "Agreement"), pursuant to which the Employee became employed, or was continued to be employed, by the Company.

WHEREAS, the Employer and the Employee wish to amend the Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in the Agreement and below, the parties agree as follows:

1.  Section 2 of the Agreement shall be and hereby is amended by adding the following subsection (g):

    (g) **Stock Awards.** The parties acknowledge that the Employee was awarded ███ shares of Aon common stock ("Awards") as of October 14, 2003 pursuant to the terms and conditions of the Plan, as amended from time to time, provided that notwithstanding anything to the contrary in the Plan, said Awards shall vest over five years.

    In addition, notwithstanding anything to the contrary in the Plan, in the event of the termination by the Company of Employee's employment without cause (as defined in Section 3(ii), vesting shall continue after termination of employment to the same extent as if the Employee had continued employment without termination. The Awards shall cease to vest (either before or after termination of employment) in the event the Employee fails to comply with the provisions of Sections 4(d) and 4(e) and 6 herein and notwithstanding the expiration of the period specified therein.

2.  Except as expressly amended herein, all other terms and conditions of the Agreement shall remain in full force and effect.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment Two to the Agreement as of the day and year first above written.

AON RISK SERVICES , INC. OF FLORIDA

By:_____

Noel D. Dunn
Executive Vice President

I have read the above Amendment to the Agreement and understand and agree to be bound by its terms.

_____
**Michael Landa**

## AMENDMENT NO. 3 TO EMPLOYMENT AGREEMENT

**THIS AMENDMENT NO. 3 TO EMPLOYMENT AGREEMENT** ("Amendment Three"), dated and effective as of January 1, 2006, by and between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive, Miami, Florida (the "Employer"), and Michael Landa, residing at 9418 W. Broadview Drive, Bay Harbor, Florida (the "Employee").

**WHEREAS**, the Employer and the Employee entered into that certain Employment Agreement dated January 1, 2001, as amended November 15, 2002, and December 1, 2003 (collectively, the "Agreement"), pursuant to which the Employee became employed, or was continued to be employed, by the Company.

**WHEREAS**, the Employer and the Employee wish to amend the Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in the Agreement and below, the parties agree as follows:

1. Section 1 of the Agreement shall be and hereby is amended by deleting "December 31, 2007", and substituting in lieu thereof "December 31, 2010".

2. Section 2 (b)(i), 2(b)(ii), and 2(b)(iii) of the Agreement shall be and hereby are deleted in their entirety and replaced with the following:

   (b) **Salary and Compensation.**

       (i)    Unless the Company fixes a higher rate for the Employee during the Term of Employment, Employee shall be paid an annual base salary (the "Base Salary") of ▮▮▮▮▮▮ payable in accordance with the Company's normal payroll practices and procedures.

       (ii)    For each six-month period of the Term, such periods ending on each June 30 and December 31, Employee shall be entitled to receive as compensation amounts based upon New Business Revenue, as defined below, generated for Aon Risk Services Companies, Inc., including its subsidiaries (hereafter "ARS") from each new client or customer or each new line produced by Employee during such six-month period (the "New Business Bonus"), as follows: 1) ▮▮▮ of New Business Revenue which is new recurring business, and 3) ▮▮▮ of New Business Revenue which is new non-recurring business. For New Business Revenue produced hereunder through December 31, 2007, payment of the New Business Bonus shall be made in cash within 45 days after the end of each June 30 and December 31 of the Term. For New Business Revenue produced hereunder commencing as of January

1, 2008, and for the balance of the Term, payment of the New Business Bonus shall be made pursuant to and in accordance with the Aon Incentive Stock Program ("Program") in effect as of January 1, 2006 (without regard to subsequent amendment, if any), payable in a combination of cash and Aon restricted stock units; provided, however, that notwithstanding anything to the contrary in the Program, in the event of a termination of the Employee's employment with the Company other than for cause pursuant to Section 3(a)(iii), the Aon restricted stock units that are granted as described herein shall continue to vest to the same extent and in accordance with the same schedule as if the Employee had continued employment with the Company. In addition, notwithstanding the foregoing, in the event that the Company ceases to utilize the Aon Incentive Stock Program, in any form, the New Business Bonus shall be payable in cash, for New Business Revenue for the calendar year in which the Aon Incentive Stock Program ceases operation and thereafter for the balance of the Term.

As used in this Agreement, "New Business Revenue" (also referred to as "New Business") shall mean the gross annual fees and commissions, or, where revenue is in the form of premiums, commission equivalents, on business produced by the Employee and collected by ARS as well as fees paid on non-recurring business in accordance with ARS income recognition policy during each calendar year, less surplus lines taxes and/or stamping fees, and sub-brokerage and co-brokerage payments, from clients or customers not reflected on the books of ARS as a client or customer of Employee on December 31 of each prior calendar year or from new lines of revenues from existing clients or customers of Employee as reflected on the books of the Company or any of its affiliates.

(iii)    In addition, for each six-month period of the Term, such periods ending on each June 30 and December 31, Employee shall be entitled to receive as compensation amounts based upon business revenue produced by the Employee and collected by ARS during such six-month period, as follows: 1) ▮▮ of gross revenue which is "builders risk" business, less surplus lines taxes and/or stamping fees, and sub-brokerage and co-brokerage payments, and 2) ▮▮ of gross revenue which is Owner Controlled Insurance Program ("OCIP") business and OCIP-related business, less surplus lines taxes and/or stamping fees, and sub-brokerage and co-brokerage payments.    For business revenue produced hereunder through December 31, 2007, payment of compensation hereunder shall be made in cash within 45 days after the end of each June 30 and December 31 of the Term.    For business revenue produced

hereunder commencing as of January 1, 2008, and for the balance of the Term, payment of compensation hereunder shall be made pursuant to and in accordance with the Aon Incentive Stock Program in effect as of January 1, 2006 (without regard to subsequent amendment, if any), payable in a combination of cash and Aon restricted stock units; provided, however, that notwithstanding anything to the contrary in the Program, in the event of a termination of the Employee's employment with the Company other than for cause pursuant to Section 3(a)(iii), the Aon restricted stock units that are granted as described herein shall continue to vest to the same extent and in accordance with the same schedule as if the Employee had continued employment with the Company. In addition, notwithstanding the foregoing, in the event that the Company ceases to utilize the Aon Incentive Stock Program, in any form, the New Business Bonus shall be payable in cash, for New Business Revenue for the calendar year in which the Aon Incentive Stock Program ceases operation and thereafter for the balance of the Term

3.  Except as expressly amended herein, all other terms and conditions of the Agreement shall remain in full force and effect.

        **IN WITNESS WHEREOF**, the parties hereto have executed this Amendment Three to the Agreement as of the day and year first above written.


                                    **AON RISK SERVICES, INC. OF FLORIDA**

                                    By:_____
                                        Noel L. Dunn
                                        Executive Vice President


        I have read the above Amendment to the Agreement and understand and agree to be bound by its terms.

                                    _____
                                        **Michael Landa**

## AMENDMENT NO. 4 TO EMPLOYMENT AGREEMENT

**THIS AMENDMENT NO. 4 TO EMPLOYMENT AGREEMENT** ("Amendment Four") is dated as of February 7, 2007, by and between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive, Miami, Florida (the "Employer"), and Michael Landa, residing at 9418 W. Broadview Drive, Bay Harbor, Florida (the "Employee").

**WHEREAS**, the Employer and the Employee entered into that certain Employment Agreement dated January 1, 2001, as amended from time to time thereafter (collectively, the "Agreement"), pursuant to which the Employee became employed, or was continued to be employed, by the Company.

**WHEREAS**, the Employer and the Employee wish to amend the Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in the Agreement and below, the parties agree as follows:

1. Section 2 of the Agreement shall be and hereby is amended by adding the following sub-Section 2(h):

    (h) **2006 Stock Awards.** The parties acknowledge that the Employee was awarded ▮▮▮▮ restricted units of Aon common stock ("Awards") as of September 14, 2006 pursuant to the terms and conditions of the Plan, as amended from time to time, which Awards shall vest over a period of five years from the grant date as follows: ▮▮▮▮ upon the completion of three years of continuous employment from the grant date; ▮▮▮▮ upon the completion of four years of continuous employment from the grant date; and ▮▮▮▮ upon the completion of five years of continuous employment from the grant date.

    In addition, notwithstanding anything to the contrary in the Plan, in the event of the termination by the Company of Employee's employment without cause (as defined in Section 3(ii)), vesting of the Awards shall continue after termination of the Employee's employment to the same extent as if the Employee had continued employment without termination. The Awards shall cease to vest (either before or after termination of employment) in the event the Employee fails to comply with the provisions of Sections 4(d) and 4(e) and 6 herein and notwithstanding the expiration of the period specified therein.

2. Except as expressly amended herein, all other terms and conditions of the Agreement shall remain in full force and effect.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment Four to the Agreement as of the day and year first above written.

**AON RISK SERVICES, INC. OF FLORIDA**

By:_____

Richard E. Barry
Vice President & Assistant Secretary -Law

I have read the above Amendment to the Agreement and understand and agree to be bound by its terms.

_____
**Michael Landa**

## AMENDMENT FIVE
## TO EMPLOYMENT AGREEMENT

**THIS AMENDMENT FIVE TO EMPLOYMENT AGREEMENT** ("Amendment Five") is dated as of January 1, 2009, by and between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive, Miami, Florida (the "Employer"), and Michael Landa, residing at 9418 W. Broadview Drive, Bay Harbor, Florida (the "Employee").

**WHEREAS**, the Employer and the Employee entered into that certain Employment Agreement dated January 1, 2001, as amended from time to time thereafter (collectively, the "Agreement"), pursuant to which the Employee became employed, or was continued to be employed, by the Company; and

**WHEREAS**, Employee and the Company desire to extend the term of the Agreement and provide for additional terms and conditions.

**NOW, THEREFORE**, in consideration of the recitals mutual covenants and agreements set forth in the Agreement and below, the parties agree as follows:

1. All capitalized terms used but not defined herein shall have the meaning accorded to them in the Agreement.

2. Section 1 of the Agreement shall be amended to extend the Term of Employment to and including December 31, 2013.

3. Section 2(b) of the Agreement is hereby deleted and replaced with the following:

(b) **Base Salary**. Unless the Company fixes a higher rate for the Employee during the Term of Employment, the Company shall pay compensation to the Employee at the rate of ▮▮▮▮▮▮ per year (the "Base Salary"), payable in accordance with the usual payroll schedule of the Company, which shall be increased at a rate of ▮ annually on or about April 1 of each year, commencing in 2010.

4. Sections 3(a)(i) and 3(a)(ii) of the Agreement shall be deleted in their entirety and replaced with the following:

(i) **Death or Disability**. This Agreement shall be terminated upon the death or total disability (as defined under the Aon Long Term Disability Plan or its successor plan) of the Employee; provided, however, (A) in the event of Employee's death during the Term of Employment the Company shall pay an

amount equal to the Base Salary for the remainder of the Term of Employment in accordance with the Company's normal payroll schedule, which such amount shall be reduced by the amount of life insurance benefits payable to the beneficiary of Employee pursuant to Company-sponsored life insurance coverages and (B) in the event of Employee's total disability, an amount equal to the Base Salary shall be paid for the remainder of the Term of Employment in accordance with the Company's normal payroll schedule, which such amount shall be reduced by the amount of disability insurance benefits payable to Employee pursuant to Company-sponsored disability insurance coverages.

(ii) **Without Cause.** This Agreement may be terminated by the Company or the Employee without cause on no less than ninety (90) days advance notice (the "Notice Period"). If terminated without cause by the Company, the Company shall pay Employee all accrued but unpaid Base Salary and benefits as of the date of such termination. In addition, if terminated without cause by the Company, so long as Employee continues to abide by the provisions of Sections 4(d), 4(e) and 6 herein, the Company shall continue to pay Employee an amount equal to the Base Salary as and when it would be paid to its employees generally until the earlier of a) the end of the Term of Employment or b) two (2) years from the date of such termination; and shall effectuate the terms and conditions of Sections 2(b), 2(h) and 2(g) of this Agreement.

Notwithstanding anything to the contrary in the foregoing paragraph, the Company may require Employee to leave Company premises immediately upon the giving of notice. Such a requirement shall not relieve the Company of its obligations to continue Base Salary or benefits during the Notice Period.

In the event Employee terminates this Agreement without cause, for any reason or no reason, the Company shall only be required to pay Employee all accrued but unpaid Base Salary and benefits as of the date of such termination.

5. Sections 8(d) and 8(e) of the Agreement are hereby deleted in its entirety and the following Section 8(d) substituted in lieu thereof:

(d) **Governing Law; Waiver of Jury Trial; Venue.** The validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Florida, without regard to the conflict of law principles, rules or statutes of any jurisdiction. In the event of a legal action filed or brought by either party relating to the validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, each of the Company and the Employee hereby agree that it and he now and forever waives any and all rights to a trial by jury irrespective of the law principles, rules or statutes of any jurisdiction or of the nature of the cause of action. Venue for all actions or proceeding arising out of or

2

relating to this Agreement shall be in the State or Federal Courts located in Miami-Dade, Florida.

6. Except as amended herein, the Agreement shall continue unmodified and in full force and effect.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment Five as of the date first subscribed above.

**AON RISK SERVICES, INC. OF FLORIDA**

By:_____

Richard E. Barry
Vice President & Assistant Secretary-Law

Date: _December 2, 2008_

_____

Michael Landa

Date: _Dec. 2, 2008_

3

## AMENDMENT SIX
## TO EMPLOYMENT AGREEMENT

THIS AMENDMENT SIX TO EMPLOYMENT AGREEMENT is dated and effective as of June 21, 2013 between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located at 1001 Brickell Bay Drive in Miami, Florida (the "Company"), and Michael Landa, residing in Bay Harbor, Florida (the "Employee").

WHEREAS, the Employee and the Company are parties to an Employment Agreement dated as of January 1, 2001, as amended from time to time thereafter (collectively, the "Agreement"); and

WHEREAS, the Employee and the Company desire to extend the term of the Agreement, and modify certain other terms and conditions;

NOW, THEREFORE, in consideration of the recitals, mutual covenants and agreements set forth in the Agreement and below, the parties agree as follows:

1. All capitalized terms used but not defined herein shall have the meaning accorded to them in the Agreement.

2. Section 1 of the Agreement hereby is amended to extend the Term of Employment to and including December 31, 2018.

3. Effective January 1, 2014, Section 2(b) of the Agreement will be deleted in its entirety and replaced with the following:

   (b)   **Base Salary and Incentive Compensation.**

   (i)   The Company will pay compensation to the Employee during the Term at the gross rate of _____ per year (the "Base Salary"), payable in accordance with the usual payroll schedule of the Company. All amounts and benefits payable under this Agreement shall be subject to any and all required or authorized withholding and deductions.

   (ii)   During the Term of Employment, in any calendar year that the Employee's annual revenue exceeds _____ the Employee will be entitled to receive a bonus in the gross amount of _____ payable in a lump sum on or about (but in no event later than) March 15 of the immediately subsequent calendar year. For purposes of this Agreement, the Employee's annual revenue will be determined by the Company in accordance with the

1

Company's income recognition and other policies and based upon the books and records of the Company, which books and records shall be conclusive and binding.

4.  The following provisions hereby are inserted as Sections 8(i) and 8(j) of the Agreement:

(i)     **Prohibition on Acceleration of Payments.**  The time or schedule of any payment or amount scheduled to be paid pursuant to the terms of this Agreement, including but not limited to any restricted stock unit or other equity-based award, payment or amount that provides for the 'deferral of compensation' (as such term is described under Code Section 409A), may not be accelerated except as otherwise permitted under Code Section 409A and the guidance and Treasury regulations issued thereunder.

(j)     Code Section 409A.  The parties intend that this Agreement and the benefits provided hereunder be interpreted and construed to comply with Code Section 409A to the extent applicable thereto. The time and form of payment of incentive compensation, disability benefits, severance payments, expense reimbursements and payments of in-kind benefits described herein will be made in accordance with the applicable sections of this Agreement, provided that with respect to termination of employment for reasons other than death, the payment at such time can be characterized as a "short-term deferral" for purposes of Code Section 409A or as otherwise exempt from the provisions of Code Section 409A, or if any portion of the payment cannot be so characterized, and the Employee is a "specified employee" under Code Section 409A, such portion of the payment will be delayed until the earlier to occur of the Employee's death or the date that is six months and one day following the Employee's termination of employment (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this section will be paid or reimbursed to the Employee in a lump sum, and any remaining payments due under this Agreement will be payable at the same time and in the same form as such amounts would have been paid. Further, if the Employee is a "specified employee" and if any equity-based awards granted to the Employee by the Company, pursuant to this Agreement or otherwise, continue to vest upon the Employee's termination of employment, and are deemed a "deferral of compensation" (as such term is described under Code Section 409A), the equity-based awards will not be settled or released until the expiration of the Delay Period. For purposes of applying the provisions of Code Section 409A, each separately identifiable amount to which the Employee is entitled will be treated as a separate payment. In addition, the disability benefits and severance payments will be treated as a series of separate payments.

Notwithstanding anything to the contrary in this Agreement, if any amounts payable under this Agreement constitutes the payment of non-qualified deferred compensation within the meaning of Code Section 409A, then if the period

2

during which the Employee has discretion to execute or revoke this Agreement straddles two taxable years of the Employee, then the Company shall make such severance payments starting in the second of such taxable years, regardless of which taxable year the Employee actually delivers the executed general release of claims to the Company. The Employee may not, directly or indirectly, designate the calendar year of payment.

Although the Company intends to administer the Agreement so that it will comply with the requirements of Code Section 409A, the Company does not represent or warrant that the Agreement will comply with Code Section 409A or any other provision of federal, state, local, or non-United States law. Provided that the Company administers this Agreement in a manner consistent with the terms of this Agreement, neither the Company, its subsidiaries, nor their respective directors, officers, employees or advisers will be liable to the Employee (or any other individual claiming a benefit through the Employee) for any tax, interest, or penalties the Employee may owe as a result of compensation paid under the Agreement, and the Company and its subsidiaries will have no obligation to indemnify or otherwise protect the Employee from the obligation to pay any taxes pursuant to Code Section 409A.

5.  Except as amended herein, the Agreement shall continue unmodified and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment Six to Employment Agreement as of the date first subscribed above.

AON RISK SERVICES, INC.
OF FLORIDA

By: _Michael Parish_

Printed Name: _Michael Parrish_

Its: _Managing Director_

Michael Landa

3

# EXHIBIT 6

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is dated and effective as of January 1, 2019 between Aon Risk Services, Inc. of Florida (the "Company"), and Michael Landa, residing in ███████████ (the "Employee").

WHEREAS, the Company wishes to continue to employ the Employee, and the Employee wishes to remain employed with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the parties agree:

Section 1. **Employment; Term.**

The Company agrees to continue to employ the Employee as a key employee and the Employee agrees to continue to serve in such capacity with the duties set forth in Section 4 for a term (the "Term" or "Term of Employment") beginning on January 1, 2019, and ending on December 31, 2023 unless renewed pursuant to Section 3 hereof, or terminated during the Term of Employment as fully set forth in Section 3.

Section 2. **Consideration; Compensation During Term of Employment.**

(a)      **Consideration.**  The consideration for entering into this Agreement will be the performance of services by the Employee pursuant to this Agreement and the continued employment of the Employee by the Company as well as the other payments and benefits provided under this Section 2.

(b)      **Base Salary.**  The Company will pay compensation to the Employee at the gross rate of ██████████ per year (the "Base Salary") for each calendar year 2019, 2020, 2021, 2022 and 2023 payable in accordance with the usual payroll schedule of the Company.  All amounts and benefits payable under this Agreement shall be subject to any and all required or authorized withholding and deductions.

(c)      **Incentive Compensation.** During the Term of Employment, in any calendar year that the Employee's newly generated Health & Benefits revenue is at least equal to or exceeds ████████, the Employee shall be eligible to receive a bonus in the gross amount of ████████, payable at such time in the calendar year immediately following December 31 as incentive compensation generally is paid by the Company but in all events before March 15 of the calendar year following the year in which the bonus is earned and provided that the Employee is employed at the time of payment.

In addition, during the Term of Employment in any calendar year that the Employee's newly generated Property & Casualty  revenue is at least equal to or exceeds ████████, the Employee shall be eligible to receive a bonus in the gross amount of ████████, payable at such time in the calendar year immediately following December 31 as incentive compensation generally is paid by the Company but in all events before March 15

of the calendar year following the year in which the bonus is earned and provided that the Employee is employed at the time of payment.

"Newly generated Property & Casualty & Health & Benefits revenue" shall mean the gross fees and commissions, or where revenue is in the form of premium, commission-equivalents, produced by the Employee on client accounts in which he is the originator and/or the account manager, and collected by Aon Risk Services Companies, Inc., (including US Retail Health & Benefits, but exclusive of revenue generated for any subsidiary outside of ARS US Retail), during the preceding 12-month period as of each December 31, exclusive of excess/surplus lines taxes and/or stamping fees, and less any subbrokerage and co-brokerage payments, and adjusted for audits, additions and returns. Whether revenue is "produced" by the Employee shall be determined by the Company's books and records (including, without limitation, its "Bridge" financial reporting system) and in accordance with the Company income recognition and other policies, which books, records and policies shall be conclusive and binding.

(d) **Employee Benefits**. During the course of employment, the Employee will enjoy the customary benefits that are generally afforded to employees of the Company. The Employee also will be entitled to participate in employee benefit plans now or hereafter provided or made available to the Company's employees generally, such as group medical, life, disability insurance, 401(k) plan, flexible spending accounts for dependent care and health care and long term care. Nothing in this Agreement will require the Company to establish, maintain or continue any of the benefits already in existence or hereafter adopted for employees of the Company and nothing in this Agreement will restrict the right of the Company to amend, modify or terminate such benefit programs.

(e) **Vacation Time**. The Employee will not accrue vacation time, but will be entitled to paid vacation time in accordance with usual Company practices applicable to similarly situated employees.

(f) **Business Expenses; Travel; Entertainment Expenses**. In accordance with Company policies and procedures and on prescribed Company forms, the Company will reimburse the Employee for business expenses and entertainment expenses incurred by the Employee.

Section 3. **Renewal; Termination.**

(a) **Renewal**. This Agreement may be renewed upon (i) the issuance by the Company of a notice of renewal ("Notice of Renewal") to the Employee at least ninety (90) days prior to the end date of the Term of Employment or any renewal period thereof and (ii) the written acceptance of the Notice of Renewal by the Employee within (60) days thereafter.

(b) **Termination.**

2

(i) **Death or Disability**. This Agreement will be terminated upon the death or total disability (as defined under the Aon Long Term Disability Plan or its successor plan) of the Employee or in the event that the Employee becomes otherwise disabled through any illness, injury, accident or condition of either a physical or psychological nature so as to be unable to perform substantially all of the Employee's duties and responsibilities for one hundred eighty (180) consecutive calendar days.

(ii) **Without Cause.** This Agreement may be terminated by the Company or the Employee without cause on no less than ninety (90) days' advance notice (the "Notice Period"). If terminated without cause by the Company, the Company will pay the Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination, payable no later than the next regularly scheduled payday after such effective termination date or, if applicable, at such time as set forth in the applicable benefit policy, plan or program. In addition, if terminated without cause by the Company, so long as the Employee continues to abide by the provisions of Sections 4(d), 4(e) and 6 herein and further provided that the Employee signs and returns an agreement containing a release of claims in a form typically used by or otherwise acceptable to the Company within the period of time set forth therein (without revoking it, if applicable), the Employee will be paid the greater of: (a) the benefits payable under the Aon Severance Plan; or (b) an amount equal to the Base Salary the Employee would have been paid until the earlier of (x) the end of the Term of Employment, or (y) two (2) years from the date of such termination, payable in installments as and when it would be paid to its employees generally per the Company's regular payroll schedule.

Notwithstanding anything to the contrary in the foregoing paragraph, the Company may require the Employee to leave Company premises immediately upon the giving of notice. Such a requirement will not relieve the Company of its obligations to provide the compensation or benefits described in the preceding paragraph.

In the event the Employee terminates this Agreement for any reason or no reason, the Company will only be required to pay Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination, as set forth above.

(iii) **For Cause.** The Company may at any time during the initial Term of Employment and during any renewals thereof, terminate this Agreement for "cause", effective immediately by written notice of termination given to the Employee setting forth the basis for such termination. For the purposes of this Agreement, "cause" will mean the Employee's (A) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Employee's employment with the Company, or breach of the

3

duty of loyalty to the Company, (B) performing an act of race, sex, national origin, religion, disability, or age-based discrimination, or sexual harassment, which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and/or the Employee, (C) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct, which violation (if curable) is not cured within five (5) business days following the Company's written notice to the Employee of such violation, (D) material non-compliance with the terms of this Agreement, including but not limited to Sections 4 and 6 hereunder, or any other agreement with the Company or any of its subsidiaries or affiliates, which non-compliance (if curable) is not cured within five (5) business days following the Company's written notice to the Employee of such non-compliance, or (E) performing any criminal act resulting in a criminal felony charge brought against the Employee or a criminal conviction of the Employee (other than a conviction of a minor traffic violation).

In the event of a termination for "cause," the Company will only be required to pay the Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination, payable no later than the next regularly scheduled payday after such effective termination date or, if applicable, at such time as set forth in the applicable benefit policy, plan or program.

(iv) As of the effective date of termination, the Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in the Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect the Employee's resignation as an officer or director of the Company and its subsidiaries and affiliates.

(v) Upon the effective date of termination, or other expiration of this Agreement, the obligations of the parties under this Agreement will cease, other than the Employee's obligations under Sections 3(c), 4, 5, 6, and 8, the Company's obligations (if any) under Section 3(b) and rights under Section 7, and any other provision that contemplates performance or observance by either or both parties subsequent to any termination or other expiration of this Agreement, each of which will survive any termination or other expiration of this Agreement and continue in full force and effect.

(vi) Any agreement herein by the Company to continue to pay Base Salary or any other benefits after the termination of employment will be in lieu of, and not in addition to, any benefits provided by the Aon Severance Plan, as described in Section 3(b)(ii).

(c)     The Employee agrees that, prior to the commencement of any new employment in the Business (as defined hereinafter), the Employee will furnish the prospective new employer with a copy of this Agreement.  The Employee also agrees that the Company may advise any prospective new employer of the Employee of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

Section 4. **Restrictive Covenants**.

(a)     **Business Considerations**. Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company, and its parent Aon Corporation, a Delaware corporation, and Aon plc (collectively "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  The Employee further acknowledges that the Employee's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Employee is physically employed and resides.  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that the Employee has acquired and will acquire, for the purpose of furthering the Business, knowledge of Aon's Confidential Information, as defined in Section 6 of this Agreement.  Employee further acknowledges Aon's legitimate interest in safeguarding Confidential Information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the

benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and employment relationships and its investment therein as above-described, its goodwill, and its Confidential Information, and acknowledges and agrees that the covenants contained in Section 4(d) below are necessary for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public.

(b)     **Duties**.  The Employee agrees during the course of employment to solicit, handle business for, or render services related to the Business as an employee of the Company and to well perform these and such other duties and assignments relating to the Business of the Company (to the extent not inconsistent with the Employee's experience and qualifications) as the management of the Company directs. The Employee will be based in Dade County, Florida.

(c)     **Exclusivity**.  During the course of employment the Employee will, except during customary vacation periods and periods of illness, devote the Employee's entire business time and attention to the performance of the duties hereunder and to promoting the best interests of Aon. The Employee will not, either during or outside of normal business hours, directly or indirectly, engage in any aspect of business of the type in which Aon is engaged for or on behalf of any entity other than Aon, nor (except as otherwise provided by law or in Section  6(c) below) intentionally engage in any activity inimical to the best interests of Aon. The foregoing shall not be construed as preventing the Employee from making passive investments in other businesses or enterprises, provided that such passive investments do not require services on the part of the Employee that would impair the performance of his duties hereunder.

(d)     **Covenant Not to Solicit**.  The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for two (2) years after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon,  any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of Aon either on the date of termination of Employee's employment with the Company or within twelve (12) months

6

prior to such termination and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company. "Client" means any person or entity listed on the books of Aon as such.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of Aon.

Nothing in this Agreement will prohibit the Employee from obtaining a livelihood for himself or his family by being engaged in the Business. The intent of the parties is that the Employee's restrictive covenant is limited only to those clients as above specified.

(e)     **Covenant Not to Solicit Employees**.  The Employee hereby also agrees, for the duration of the term of the covenant set forth in Section 4(d) of this Agreement, not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon.

Section 5. **Company's Right to Injunctive Relief; Attorneys' Fees and Costs**.

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 4 or 6 of this Agreement will result in irreparable and continuing harm to the Company or Aon, or both, and that therefore, in addition to any other remedy which the Company or Aon, or both, may have at law or in equity, the Company and Aon will be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Employee (without the need to post any bond or other security). The parties acknowledge and agree that Aon Corporation and Aon Group, Inc. are intended third-party beneficiaries of this Agreement, and may be named plaintiffs in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that any action is filed in relation to Section 4 or 6 of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

Section 6. **Trade Secrets and Confidential Information; Inventions**.

(a)     **Trade Secrets and Confidential Information**.  The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of the Employee's employment by the Company, and to assist the Employee in the solicitation, production and

servicing of client business, the Employee will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Employee's breach of this Agreement or a breach by another person of some other obligation.

The Employee will not, except as required in the course of employment hereunder or as provided by applicable law or in Section 6(c) below, disclose or use during or subsequent to the course of employment, any Confidential Information. All Confidential Information and all records and equipment and other materials relating in any way to Confidential Information, and all other Aon property, will be and remain the sole property of Aon during and after the end of employment.

Upon termination of employment or upon the Company's request (whichever is earlier), the Employee will promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Employee's possession or control, except as otherwise provided by law or in Section 6(c) below. The Employee agrees to represent in writing to the Company upon termination of employment that he or she has complied with the provisions of this Section 6.

(b) **Inventions**. The Employee hereby assigns to the Company the Employee's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by the Employee during the Employee's employment and which may pertain directly or indirectly to the business of the Company or any of its affiliates, parent companies, or subsidiaries, and which the Employee hereby agrees is work for hire performed in the scope of the Employee's employment. The Employee agrees to disclose fully all such developments to the Company upon its request, which disclosure will be made in writing promptly following any such request. The Employee will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its affiliates, parent companies, or subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.

The Employee acknowledges and agrees that the Employee hereby is and has been notified by the Company, and understands, that the foregoing provisions of this Section 6(b) do not apply to an invention for which no equipment, supplies, facilities or trade secret information of the Company or any of its parent companies, subsidiaries or other affiliates

8

was used and which was developed entirely on the Employee's own time, unless: (x) the invention relates (i) to the business of the Company or any of its parent companies, subsidiaries or other affiliates or (ii) to the Company's or any of its parent companies', subsidiaries' or other affiliates' actual or demonstrably anticipated research and development, or (y) the invention results from any work performed by the Employee for the Company or any of its parent companies, subsidiaries or other affiliates.

(c)  **No Interference.**  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement prohibits the Employee from confidentially or otherwise communicating or filing a charge or complaint with a governmental or regulatory entity, participating in a governmental or regulatory entity investigation, or giving truthful testimony or statements or making other disclosures to a governmental or regulatory entity, in each case without having to disclose any such conduct to the Company, or from responding if properly subpoenaed or otherwise required to do so under applicable law. Nothing in this Agreement shall limit the Employee's ability (i) to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

Section 7.  **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.  By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 7 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement will be binding upon and will inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred.  This Agreement will not be assignable by the Employee, but in the event of the Employee's death it will be binding upon and inure to the benefit of the Employee's legal representatives to the extent required to effectuate its terms.

Section 8.  **Miscellaneous.**

(a)    **Integration**.  Except as is otherwise provided herein, this Agreement contains all of the terms and conditions agreed upon by the parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, whether oral or written, respecting the subject matter of this Agreement.  Notwithstanding the foregoing and any other language in this Agreement, this Agreement does not supersede or preclude the enforceability of any restrictive covenant provision contained in any prior agreement

entered into by the Employee.   Further, no prior restrictive covenant supersedes or precludes the enforceability of any provision contained in this Agreement.

This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement (subject to Section 8(f) below).

(b)      **Waiver**.  Waiver of any term or condition of this Agreement by any party will not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.

(c)      **Captions.**  The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect.  If any caption is inconsistent with any provision of this Agreement, such provision will govern.

(d)      **Governing Law; Waiver of Jury Trial**.   The validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, will be governed by and construed in accordance with the substantive laws of the state of the Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction. In the event of a legal action filed or brought by either party relating to the validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, each of the Company and the Employee hereby agree that it and he now and forever waives any and all rights to a trial by jury irrespective of the law principles, rules or statutes of any jurisdiction or of the nature of the cause of action.

(e)      **Agreement To Be Available In Future Proceedings**.  During the period of employment, and after employment termination, the Employee agrees to voluntarily make himself or herself available to the Company and its legal counsel, at the Company's request, at reasonable times and upon reasonable notice, without the necessity of obtaining a subpoena or court order, in the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter.  The Employee agrees to provide any information reasonably within the Employee's recollection, subject to Section 6(c) above.  The Company will reimburse the Employee for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at Company's option, will arrange to advance Employee's expenses or incur such expenses directly.

(f)      **Modification; Severability**.  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence will be modified in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws.  If, however, a court of competent jurisdiction finds that any such

term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

(g)     **Notice.**  All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, will be addressed to it and delivered to it at its principal office for the attention of the Secretary of the Company.  If intended for the Employee, notices will be delivered personally or will be addressed (if sent by mail) to the Employee's then current residence address as shown on the Company's records, or to such other address as the Employee directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

(h)     **Prohibition on Acceleration of Payments.**  The time or schedule of any payment or amount scheduled to be paid pursuant to the terms of this Agreement, including but not limited to any restricted stock unit or other equity-based award, payment or amount that provides for the 'deferral of compensation' (as such term is described under Code Section 409A), may not be accelerated except as otherwise permitted under Code Section 409A and the guidance and Treasury regulations issued thereunder.

(i)     **Code Section 409A.**  The parties intend that this Agreement and the benefits provided hereunder be interpreted and construed to comply with Code Section 409A to the extent applicable thereto.  The time and form of payment of incentive compensation, disability benefits, severance payments, expense reimbursements and payments of in-kind benefits described herein will be made in accordance with the applicable sections of this Agreement, provided that with respect to termination of employment for reasons other than death, the payment at such time can be characterized as a "short-term deferral" for purposes of Code Section 409A or as otherwise exempt from the provisions of Code Section 409A, or if any portion of the payment cannot be so characterized, and the Employee is a "specified employee" under Code Section 409A, such portion of the payment will be delayed until the earlier to occur of the Employee's death or the date that is six months and one day following the Employee's termination of employment (the "Delay Period").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this section will be paid or reimbursed to the Employee in a lump sum, and any remaining payments due under this Agreement will be payable at the same time and in the same form as such amounts would have been paid.  Further, if the Employee is a "specified employee" and if any equity-based awards granted to the Employee by the Company, pursuant to this Agreement or otherwise, continue to vest upon the Employee's termination of employment, and are deemed a "deferral of compensation" (as such term is described under Code Section 409A), the equity-based awards will not be settled or released until the expiration of the Delay Period.  For purposes of applying the provisions of Code Section 409A, each separately identifiable amount to which the Employee is entitled will be treated as a separate payment.  In addition, the disability benefits and severance payments will be treated as a series of separate payments.  Any reimbursement payable to the Employee

11

pursuant to this Agreement shall be conditioned on the submission by the Employee of all expense reports reasonably required by the Company under any applicable expense reimbursement policies in effect or amended from time to time in the Company's discretion, and shall be reimbursed to the Employee as set forth in such policies, but in no event later than the last day of the calendar year following the calendar year in which the Employee incurred the reimbursable expense. Any amount of expenses eligible for reimbursement or in-kind benefit provided during a calendar year shall not affect the amount of expenses eligible for reimbursement or in-kind benefit to be provided during any other calendar year.

Notwithstanding anything to the contrary in this Agreement, if any amounts payable under this Agreement constitutes the payment of non-qualified deferred compensation within the meaning of Code Section 409A, then if the period during which the Employee has discretion to execute or revoke a release agreement straddles two taxable years of the Employee, then the Company shall make such severance payments starting in the second of such taxable years, regardless of which taxable year the Employee actually delivers the executed general release of claims to the Company. The Employee may not, directly or indirectly, designate the calendar year of payment.

Although the Company intends to administer the Agreement so that it will comply with the requirements of Code Section 409A, the Company does not represent or warrant that the Agreement will comply with Code Section 409A or any other provision of federal, state, local, or non-United States law. Provided that the Company administers this Agreement in a manner consistent with the terms of this Agreement, neither the Company, its subsidiaries, nor their respective directors, officers, employees or advisers will be liable to the Employee (or any other individual claiming a benefit through the Employee) for any tax, interest, or penalties the Employee may owe as a result of compensation paid under the Agreement, and the Company and its subsidiaries will have no obligation to indemnify or otherwise protect the Employee from the obligation to pay any taxes pursuant to Code Section 409A.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

AON RISK SERVICES, INC. OF FLORIDA

By: _____

Printed Name: Todd Severson

Its: VP

I have read the above Agreement and understand and agree to be bound by its terms.

_____
Michael Landa

12

# EXHIBIT 1

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is dated and effective as of January 1, 2019 (the "Effective Date") between Aon Risk Services, Inc. of Florida, a Florida corporation with offices located in Miami, Florida (the "Company"), and Giselle I. Lugones, residing in ███████████████ (the "Employee").

WHEREAS, the Company wishes to continue to employ the Employee, and the Employee wishes to remain employed with the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, the parties agree:

Section 1. **Employment; Term.**

The Company agrees to continue to employ the Employee as a key employee and the Employee agrees to serve in such capacity with the duties set forth in Section 4 for a term (the "Term" or "Term of Employment") beginning on January 1, 2019, and ending on December 31, 2023 unless renewed pursuant to Section 3 hereof, or terminated during the Term of Employment as fully set forth in Section 3.

Section 2. **Consideration; Compensation During Term of Employment.**

(a)     **Consideration.**  The consideration for entering into this Agreement will be the performance of services by the Employee pursuant to this Agreement and the continued employment of the Employee by the Company as well as the other payments and benefits provided under this Section 2.

(b)     **Base Salary.**  The Employee's annual Base Salary shall be ███████████, for the duration of the Term.  All amounts and benefits payable under this Agreement shall be subject to any and all required or authorized withholding and deductions.

(c)     **Annual Incentive Compensation**

(i) For each calendar year during the Term, subject to the terms and conditions of this Agreement, the Employee shall be entitled to receive, on an annual basis, Production Incentive Compensation (as defined below) reduced by an amount equal to the total gross amount of Base Salary paid to the Employee during the entirety of such calendar year (such calculated amount hereinafter referred to as the "Annual Incentive Compensation").  The Employee acknowledges and agrees that any Annual Incentive Compensation shall be calculated with respect to each December 31 during the Term, and, provided that all sales reports have been validated and verified for accuracy prior to the payment date and the Employee is employed as of the date of payment, such Annual Incentive Compensation shall be paid at such time in the calendar year immediately following each December 31 as incentive compensation generally is paid by the Company.  In the event this Agreement is not renewed by the

1

Company in accordance with Section 3(a) herein, and the Employee is no longer in the employ of the Company at the end of the Term, the Employee will be entitled to payment for earned "Production Incentive Compensation" as defined below under this Section (ii). The Annual Sales Incentive will be paid fully in cash and will not be subject to Aon's Incentive Stock Program.

(ii)  For each calendar year during the Term, "Production Incentive Compensation" shall be calculated, subject to the terms and conditions of this Agreement, as the sum of:

(A)  ▆▆▆ of all recurring new business and ▆▆▆ of all non-recurring new business, in each case as such terms are defined by the U.S. Retail Production Incentive Plan then in effect or as amended from time to time (the "Plan"), within the Employee's Book of Business (as defined below), and

(B)  ▆▆▆ of the renewal business, as such term is defined by the Plan, within the Employee's Book of Business, provided that any such renewal business shall expressly exclude all revenue and other amounts with respect to which the Employee was eligible to receive any incentive compensation pursuant to Subsection 2(c)(ii)(A) above.

Notwithstanding anything to the contrary in this Agreement, the Employee's Production Incentive Compensation shall not include any revenue or other amount produced or otherwise attributable to the Employee that is not expressly included in the Employee's Book of Business as defined herein and the Employee's participation in the Plan shall be subject to all other provisions, terms and conditions of the Plan, and the terms of the Plan are subject to change at the Company's sole discretion.

(iii)  For purposes of this Agreement:

(A) "Book of Business" shall mean the gross fees and commissions, or where revenue is in the form of premiums, commission-equivalents, that are: (1) produced by the Employee on client accounts as determined by the Company's books and records (including without limitation the Company's "Bridge" financial reporting system), which books and records shall be conclusive and binding, and determined in accordance with Company income recognition and other policies; (2) collected by Aon Risk Services Companies, Inc., including its subsidiaries; (3) credited to Aon Risk Solutions US Retail during the preceding twelve-month period as of each December 31 during the Term, exclusive of excess/surplus lines taxes and/or stamping fees, and less any sub-brokerage and co-brokerage payments; and (4) adjusted for audits, additions and returns; and

2

(B)   "produced by the Employee" shall be determined in accordance with ARS income recognition and other policies and based upon the books and records of ARS, which books and records shall be conclusive and binding.

(d)   **Aon United Cross Sales Incentive Plan**.  The Employee shall be eligible to participate in the Aon United Cross Sales Incentive Plan, in accordance with its terms and conditions, as amended from time to time, if in effect and applicable, including any successor programs hereafter implemented.

(e)   **Employee Benefits**.  During the course of employment, the Employee will enjoy the customary benefits that are generally afforded to employees of the Company.  The Employee also will be entitled to participate in employee benefit plans now or hereafter provided or made available to the Company's employees generally, such as group medical, life, disability insurance, 401(k) plan, flexible spending accounts for dependent care and health care and long term care.  Nothing in this Agreement will require the Company to establish, maintain or continue any of the benefits already in existence or hereafter adopted for employees of the Company and nothing in this Agreement will restrict the right of the Company to amend, modify or terminate such benefit programs.

(f)   **Vacation Time**.  The Employee will not accrue vacation time, but will be entitled to paid vacation time in accordance with usual Company practices applicable to similarly situated employees.

(g)   **Business Expenses; Travel; Entertainment Expenses**.  In accordance with Company policies and procedures and on prescribed Company forms, the Company will reimburse the Employee for business expenses and entertainment expenses incurred by the Employee.

Section 3.  **Renewal; Termination**.

(a)   **Renewal**.  This Agreement may be renewed by mutual written agreement of the parties hereto.  If it is not so renewed, and the Employee's employment with the Company continues following the expiration or termination of the Term of Employment, such employment shall be on at-will basis.

(b)   **Termination**.

(i) **Death or Disability**.  This Agreement will be terminated upon the death or total disability (as defined under the Aon Long Term Disability Plan or its successor plan) of the Employee or in the event that the Employee becomes otherwise disabled through any illness, injury, accident or condition of either a physical or psychological nature so as to be unable to perform substantially all of the Employee's duties and responsibilities for one hundred eighty (180) consecutive calendar days.

8917867-9

(ii) **Without Cause**.  This Agreement may be terminated by the Company or the Employee without cause on no less than forty-five (45) days' advance notice (the "Notice Period"); provided, however, that in the event the Employee terminates this Agreement for any reason or no reason, the Company may, in its sole discretion, waive the Notice Period and consider the Employee's termination effective immediately.  If terminated without cause by the Company, the Company will pay the Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination (including any Production Incentive Compensation earned but not yet paid, based on revenue recorded by the Company through the date of the Employee's termination and otherwise calculated in accordance with Section 2(c)(ii), reduced by the total amount of Base Salary actually received by the Employee for the year on which the Production Incentive Compensation is based), payable no later than the next regularly scheduled payday after such effective terminate date or, if applicable,  at such time as set forth in the applicable benefit policy, plan, or program.  In addition, if terminated without cause by the Company, so long as the Employee continues to abide by the provisions of Section 4 herein and further provided that the Employee signs and returns an agreement containing a release of claims in a form typically used by or otherwise acceptable to the Company within the period of time set forth therein (without revoking it, if applicable), the Employee will be paid the greater of: (a) the benefits payable under the Aon Severance Plan; or (b) an amount equal to the Base Salary the Employee would have been paid until the earlier of (x) the end of the Term of Employment, or (y)  two (2) years from the date of such termination, payable in installments as and when it would be paid to its employees generally per the Company's regular payroll schedule, payable no later than the second regularly scheduled payday after the end of the seven-day revocation period contained in the release of claims and as required by OWBPA.

Notwithstanding anything to the contrary in the foregoing paragraph, the Company may require the Employee to leave Company premises immediately upon the giving of notice.  Such a requirement will not relieve the Company of its obligations to provide the compensation or benefits described in the preceding paragraph.

In the event the Employee terminates this Agreement for any reason or no reason, the Company will only be required to pay Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination, as set forth above.

(iii) **For Cause**.  The Company may at any time during the initial Term of Employment and during any renewals thereof, terminate this Agreement for "cause", effective immediately by written notice of termination given to the Employee setting forth the basis for such termination.  For the purposes of this Agreement, "cause" will mean the Employee's (A) performing a deliberate act

4

of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Employee's employment with the Company, or breach of the duty of loyalty to the Company, (B) performing an act of race, sex, national origin, religion, disability, or age-based discrimination, or sexual harassment, which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and/or the Employee, (C) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct, which violation (if curable) is not cured within fifteen (15) business days following the Company's written notice to the Employee of such violation, (D) material non-compliance with the terms of this Agreement, including but not limited to Section 4 hereunder, or any other agreement with the Company or any of its subsidiaries or affiliates, which non-compliance (if curable) is not cured within fifteen (15) business days following the Company's written notice to the Employee of such non-compliance, or (E) performing any criminal act resulting in a criminal felony charge brought against the Employee or a criminal conviction of the Employee (other than a conviction of a minor traffic violation).

In the event of a termination for "cause," the Company will only be required to pay the Employee all accrued but unpaid Base Salary and vested benefits as of the effective date of such termination, payable no later than the next regularly scheduled payday after such effective termination date or, if applicable, at such time as set forth in the applicable benefit policy, plan or program.

(iv) As of the effective date of termination, the Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in the Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect the Employee's resignation as an officer or director of the Company and its subsidiaries and affiliates.

(v) Upon the effective date of termination, or other expiration of this Agreement, the obligations of the parties under this Agreement will cease, other than the Employee's obligations under Sections, 3(c), 4, and 6, the Company's obligations (if any) under Section 3(b) and rights under Section 5, and any other provision that contemplates performance or observance by either or both parties subsequent to any termination or other expiration of this Agreement, each of which will survive any termination or other expiration of this Agreement and continue in full force and effect.

(vi) Any agreement herein by the Company to continue to pay Base Salary or any other benefits after the termination of employment will be in lieu of, and not in addition to, any benefits provided by the Aon Severance Plan, as described in Section 3(b)(ii).

8917867-9

(c)     The Employee agrees that, prior to the commencement of any new employment in the Business (as defined hereinafter), the Employee will furnish the prospective new employer with a copy of this Agreement.  The Employee also agrees that the Company may advise any prospective new employer of the Employee of the existence and terms of this Agreement and furnish the prospective new employer with a copy of this Agreement.

Section 4.  **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Duties and Exclusivity**.

(a)     **Business Considerations**. Aon plc and its subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s subsidiaries and affiliates (and divisions thereof) including the Company (collectively, with Aon plc,  "Aon") are in the business of providing  conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").   The Employee further acknowledges that the Employee's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Employee is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of  employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.   In addition, the Employee acknowledges that the Employee has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Employee further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the

8917867-9

relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

(b)     **Covenant Not to Solicit Clients and Prospective Clients**.  The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Employee's termination of employment with Aon (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon,  any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account the Employee worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Employee's termination of employment and, further provided, such clients were clients of Aon either on the Employee's termination of employment or within twelve (12) months prior to such termination of employment and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Employee's termination of employment and to which a proposal for services was rendered by Aon during the six (6) months prior to the termination of employment.  "Client" means any person or entity listed on the books of Aon as such, or any majority-owned subsidiary of a person or entity listed on the books of Aon as a client.

(c)     **Covenant Not to Solicit Employees.**  The Employee hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon.

(d)     **Other Covenants.**  Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 6(a), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Employee, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Employee and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period.  Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.  No subsequent agreement entered into by the Employee may amend, supersede, or override the covenants contained

herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

(e)     **Acknowledgements**.  Aon and the Employee acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public.  The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Employee.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Employee's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area.  Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for the Employee or the Employee's family by being engaged in the Business.

(f)     **Company's Right to Injunctive Relief; Attorneys' Fees and Costs**.  The Employee acknowledges that the Employee's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 4 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon will be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Employee.  The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement.  In the event that any action is filed to enforce the terms and conditions of Section 4 of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

(g)     **Trade Secrets and Confidential Information; Inventions**

(i) The Employee acknowledges that Aon's Business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon.  The Employee recognizes that, by virtue of the Employee's employment by the Company, and to assist the Employee in the solicitation, production and servicing of client Business, the Employee will be granted otherwise prohibited access to such information.  This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business

plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Employee's breach of this Agreement or a breach by another person of some other obligation to Aon. The Employee will not, except as required in the course of employment hereunder or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

(ii)  The Employee understands that nothing contained in this Agreement limits the Employee's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Employee's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iii)  Upon termination of employment or upon Aon's request (whichever is earlier), the Employee will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Employee's possession or control, except as otherwise provided by law or in this subsection (g). The Employee agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

(iv)  The Employee hereby assigns to Aon the Employee's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by the Employee during the Employee's employment and which may pertain directly or indirectly to the Business, and which the Employee hereby agrees is work for hire performed in the scope of the Employee's employment. The Employee

agrees to disclose fully all such developments to Aon upon its request, which disclosure will be made in writing promptly following any such request. The Employee will upon Aon's request, execute, acknowledge and deliver to Aon all instruments and do all other acts which are necessary or desirable to enable Aon to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.        The Employee acknowledges and agrees that the Employee hereby is and has been notified by Aon, and understands, that the foregoing provisions of this subsection (g)(iv) do not apply to an invention for which no equipment, supplies, facilities, Confidential Information was used and which was developed entirely on the Employee's own time, unless:  (x) the invention relates (i) to the Business or (ii) to Aon's actual or demonstrably anticipated research and development, or (y) the invention results from any work performed by the Employee for Aon.

(h)      **Duties; Exclusivity**.  The Employee agrees during the course of employment to solicit, handle business for, or render services related to the Business as an employee of the Company and to well perform these and such other duties and assignments relating to the Business of the Company as the management of the Company directs.  During the course of employment the Employee will, except during customary vacation periods and periods of illness, devote the Employee's entire business time and attention to the performance of the duties hereunder and to promoting the best interests of Aon.  The Employee will not, either during or outside of normal business hours, directly or indirectly, engage in any aspect of business of the type in which Aon is engaged for or on behalf of any entity other than Aon, nor (except as otherwise provided by law or in subsection (g) above) intentionally engage in any activity inimical to the best interests of Aon.

Section 5.  **Mergers and Consolidations; Assignability**.

The rights and obligations under this Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.  By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 5 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement will be binding upon and will inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred.  This Agreement will not be assignable by the Employee, but in the event of the Employee's death it will be binding upon and inure to the benefit of the Employee's legal representatives to the extent required to effectuate its terms.

Section 6.  **Miscellaneous**.

(a)      **Integration**.  Except as is otherwise provided herein, this Agreement contains all of the terms and conditions agreed upon by the parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements (including but not

10

limited to the Employment Agreement dated and effective as of January 1, 2014, between the Employee and the Company), negotiations, correspondence, undertakings and communications of the parties, whether oral or written, respecting the subject matter of this Agreement. Notwithstanding the foregoing and any other language in this Agreement, this Agreement does not supersede or preclude the enforceability of any restrictive covenant provision (including without limitation Other Covenants as defined above) contained in any prior agreement entered into by the Employee. Further, no prior restrictive covenant (including without limitation Other Covenants) supersedes or precludes the enforceability of any provision contained in this Agreement.

This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement (subject to Sections 4(d) and 6(f) of this Agreement).

(b)     **Waiver**. Waiver of any term or condition of this Agreement by any party will not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing.

(c)     **Captions**. The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision will govern.

(d)     **Governing Law; Waiver of Jury Trial**. The validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, will be governed by and construed in accordance with the substantive laws of the state of the Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction. In the event of a legal action filed or brought by either party relating to the validity, interpretation, construction, performance, enforcement and remedies of, or relating to, this Agreement, and the rights and obligations of the parties hereunder, each of the Company and the Employee hereby agree that it and he now and forever waives any and all rights to a trial by jury irrespective of the law principles, rules or statutes of any jurisdiction or of the nature of the cause of action.

(e)     **Agreement To Be Available In Future Proceedings**. During the period of employment, and after employment termination, the Employee agrees to voluntarily make himself or herself available to the Company and its legal counsel, at the Company's request, without the necessity of obtaining a subpoena or court order, in the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to provide any information reasonably within the Employee's recollection, subject to Section 4(g) above. The Company will reimburse the Employee for reasonable out-of-pocket expenses actually incurred as a result of such requests, or, at Company's option, will arrange to advance Employee's expenses or incur such expenses directly.

8917867-9

(f)    **Modification; Severability**.  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence will be modified in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

(g)    **Notice**.  All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, will be addressed to it and delivered to it at its principal office for the attention of the Secretary of the Company. If intended for the Employee, notices will be delivered personally or will be addressed (if sent by mail) to the Employee's then current residence address as shown on the Company's records, or to such other address as the Employee directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

(h)    **Prohibition on Acceleration of Payments**.  The time or schedule of any payment or amount scheduled to be paid pursuant to the terms of this Agreement, including but not limited to any restricted stock unit or other equity-based award, payment or amount that provides for the 'deferral of compensation' (as such term is described under Code Section 409A), may not be accelerated except as otherwise permitted under Code Section 409A and the guidance and Treasury regulations issued thereunder.

(i)    **Code Section 409A**.  The parties intend that this Agreement and the benefits provided hereunder be interpreted and construed to comply with Code Section 409A to the extent applicable thereto. The time and form of payment of incentive compensation, disability benefits, severance payments, expense reimbursements and payments of in-kind benefits described herein will be made in accordance with the applicable sections of this Agreement, provided that with respect to termination of employment for reasons other than death, the payment at such time can be characterized as a "short-term deferral" for purposes of Code Section 409A or as otherwise exempt from the provisions of Code Section 409A, or if any portion of the payment cannot be so characterized, and the Employee is a "specified employee" under Code Section 409A, such portion of the payment will be delayed until the earlier to occur of the Employee's death or the date that is six months and one day following the Employee's termination of employment (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this section will be paid or reimbursed to the Employee in a lump sum, and any remaining payments due under this Agreement will be payable at the same time and in the same form as such amounts would have been paid. Further, if the Employee is a "specified employee" and if any equity-based awards granted to the Employee by the Company, pursuant to this Agreement or otherwise, continue to vest upon the Employee's termination of employment, and are deemed a "deferral of compensation" (as such term is described under Code Section 409A), the equity-based

12

awards will not be settled or released until the expiration of the Delay Period. For purposes of applying the provisions of Code Section 409A, each separately identifiable amount to which the Employee is entitled will be treated as a separate payment. In addition, the disability benefits and severance payments will be treated as a series of separate payments. Any reimbursement payable to the Employee pursuant to this Agreement shall be conditioned on the submission by the Employee of all expense reports reasonably required by the Company under any applicable expense reimbursement policies in effect or amended from time to time in the Company's discretion, and shall be reimbursed to the Employee as set forth in such policies, but in no event later than the last day of the calendar year following the calendar year in which the Employee incurred the reimbursable expense. Any amount of expenses eligible for reimbursement or in-kind benefit provided during a calendar year shall not affect the amount of expenses eligible for reimbursement or in-kind benefit to be provided during any other calendar year.

Notwithstanding anything to the contrary in this Agreement, if any amounts payable under this Agreement constitutes the payment of non-qualified deferred compensation within the meaning of Code Section 409A, then if the period during which the Employee has discretion to execute or revoke a release agreement straddles two taxable years of the Employee, then the Company shall make such severance payments starting in the second of such taxable years, regardless of which taxable year the Employee actually delivers the executed general release of claims to the Company. The Employee may not, directly or indirectly, designate the calendar year of payment.

Although the Company intends to administer the Agreement so that it will comply with the requirements of Code Section 409A, the Company does not represent or warrant that the Agreement will comply with Code Section 409A or any other provision of federal, state, local, or non-United States law. Provided that the Company administers this Agreement in a manner consistent with the terms of this Agreement, neither the Company, its subsidiaries, nor their respective directors, officers, employees or advisers will be liable to the Employee (or any other individual claiming a benefit through the Employee) for any tax, interest, or penalties the Employee may owe as a result of compensation paid under the Agreement, and the Company and its subsidiaries will have no obligation to indemnify or otherwise protect the Employee from the obligation to pay any taxes pursuant to Code Section 409A.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

AON RISK SERVICES, INC.

By: *Michael Parrish*

Printed Name: M.chael Parrish

Its: Managing Director

I have read the above Agreement and understand and agree to be bound by its terms.

GISELLE I. LUGONES

14

8917867-9